**John DOE, Individually and as next friend of Jane Doe, a Minor, et al., Plaintiffs–Appellees,**

v.

**DUNCANVILLE INDEPENDENT SCHOOL DISTRICT, et al., Defendants–Appellants.**

No. 94–10416.

United States Court of Appeals, Fifth Circuit.

Dec. 12, 1995.

---

**20.** *Davis v. United States,* 961 F.2d 53, 57 (5th Cir.1991).

Roger Dean Hepworth and Doanh T. Nguyen, Henslee, Ryan & Groce, Austin, TX, for Appellants.

T. Wesley Holmes, Dallas, TX, for Amici, Prichard, et al.

Elliot Shavin and Chad Baruch, Dallas, TX, for amicus American Jewish Congress.

Michael F. Linz and Frank D. Chandler, Dallas, TX, for Appellees.

Dia W. Epstein, Craig F. Simon, Figari & Davenport, Alan S. Loewinsohn, Dallas, TX, and Stephen K. Green, Washington, D.C., for Amici, Anti–Defamation League and Americans United for Separation of Church and State.

Before DAVIS and JONES, Circuit Judges, and MAHON [1], District Judge.

W. EUGENE DAVIS, Circuit Judge:

Defendants (collectively, the Duncanville Independent School District or DISD) appeal the district court's permanent injunction forbidding certain religious practices in curricular and extracurricular activities at their schools as violations of the Establishment Clause of the First Amendment of the United States Constitution. We affirm in part and reverse in part.

## I. FACTS

Plaintiffs in this case are Jane Doe, a student in the Duncanville Independent School District, and John Doe, her father. Jane Doe first enrolled in the DISD in 1988, when she entered the seventh grade at the age of twelve. Doe qualified to play on the girls' basketball team and was placed in an athletic class specially designated for team members. This class was held during the last class period of the day and extended into after school practice. Students received academic credit for this class and for their participation in the sport. During her first class, Doe learned that the girls' basketball coach, Coach Smith, included the Lord's Prayer in each basketball practice. The basketball team also said prayers in the locker rooms before games began, after games in the center of the basketball court in front of spectators, and on the school bus travelling to and from basketball games. Coach Smith initiated or participated in these prayers. These prayers had been a tradition for almost twenty years.

When she first became a team member, Doe participated in these prayers because she did not wish to single herself out. After Doe's father attended a game and saw his daughter joining in the center court prayer, he asked her how she felt about participating. When told that she preferred not to participate, John Doe told his daughter that she did not have to take part in the prayers. Thereafter, Jane Doe no longer participated. At games away from home and at least one home game, Doe was required to stand by while the team prayed. Her non-participation drew attention from her fellow students, who asked her "Aren't you a Christian?" and from one spectator, who called out "Well, why isn't she praying? Isn't she a Christian?" At one point during her history class, Doe's history teacher referred to her as a "little atheist."

John Doe complained about the prayers to the assistant superintendent of schools, Ed Parker, and his successor, Marvin Utecht. Utecht halted the prayers at pep rallies, although he insisted there was nothing he could do about the post-game prayers.

Jane Doe also joined the choir program at DISD. Students in this program also receive academic credit for their participation. In the seventh and eighth grade choruses, Doe was required to sing the choir theme song *Go Ye Now in Peace*, which is based on Christian text. Upon progressing to the high school choirs, Doe was required to sing another Christian theme song, *The Lord Bless You and Keep You*. David McCullar, the director for the ninth through twelfth grade choirs, testified that *The Lord Bless You and Keep You* had been the choirs' theme song for at least 20 years; he did not know how it had originally been chosen. The choirs learn this song as part of their overall repertoire, sing it at the end of class on Fridays, at the end of some performances and during choral competitions. They also sing this song on the bus on the way home from performances. The parties stipulated that the choir's theme song is a "Christian religious song."

DISD also engaged in a number of other religious practices or customs, such as holding prayers and distributing pamphlets containing religious songs at awards ceremonies, allowing student-initiated prayers before

---

1. District Judge of the Northern District of Texas, sitting by designation.

football games [2], allowing Gideon Bibles to be distributed to fifth grade classes, and until 1990, including prayers during school pep rallies.

On August 15, 1991, the Does filed an application for a temporary restraining order and preliminary injunction. Following a two-day trial, the district court entered a preliminary injunction forbidding DISD from permitting its employees to lead, encourage, promote or participate in prayer with or among students during curricular or extra-curricular activities, including sporting events. DISD appealed the preliminary injunction, which was affirmed by this Court in *Doe v. Duncanville Independent School District,* 994 F.2d 160 (5th Cir.1993) (*Doe I*).

At the permanent injunction hearing, the parties stipulated that since May 1991, DISD stopped all prayers during class-time.[3] Students are still allowed to initiate prayers during athletic events, but the coaches no longer do so. After the hearing, the district court found that DISD violated the Establishment Clause by (1) permitting its employees to lead, encourage, promote or participate in prayers with students during curricular or extracurricular events; (2) permitting its employees to initiate, lead, authorize, encourage or condone the recitation or singing of religious songs as the theme songs of the schools' choirs; and (3) authorizing, permitting or condoning the distribution at Duncanville schools of Gideon Bibles to fifth grade students by representatives of the Gideon Society, except to the extent permitted by the Equal Access Act. Based on these conclusions, the court enjoined DISD from continuing these practices. We discuss each of Appellants' arguments below.

## II. ANALYSIS

As we noted in *Doe I,* modern Establishment Clause jurisprudence is rife with confusion. 994 F.2d at 166 n. 7. This Court attempted to bring some order to the organization and application of the existing precedents in *Jones v. Clear Creek Indep. School District,* 977 F.2d 963 (5th Cir.1992) (*Jones II*), by identifying three tests that the Supreme Court has used to determine whether a government action or policy constitutes an establishment of religion. First, we identified the Establishment Clause test of longest lineage: the *Lemon* test. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971). Under *Lemon,* a government practice is constitutional if (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not excessively entangle government with religion. *Id.* We then recognized that the Court has also analyzed school-sponsored religious activity in terms of the coercive effect that the activity has on students. *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). Lastly, we found that the Court has disapproved of governmental practices that appear to endorse religion. *See e.g., County of Allegheny v. ACLU,* 492 U.S. 573, 594, 109 S.Ct. 3086, 3101–02, 106 L.Ed.2d 472 (1989). *See also Capitol Square Review Board v. Pinette,* —— U.S. ——, —— – ——, 115 S.Ct. 2440, 2452–2456, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring). We will adhere to this approach today.

A. Prayer at Curricular and Extra–Curricular Activities

The district court enjoined DISD, its employees and its agents from:

1. leading, encouraging, promoting, or participating in prayers with or among students during curricular or extracurricular activities, including before, during, or after school-related sporting events. Students, however, are not enjoined from praying, either individually or in groups. Students may voluntarily pray together, provided

---

2. DISD makes no attempt to distinguish the prayers given before football games and at awards ceremonies from those given at basketball games. To the extent that these situations are materially alike, our opinion applies equally.

3. However, it appears that prayers did not stop during basketball practice.

such prayer is not done with school participation or supervision.

DISD argues that the district court erred by forbidding DISD employees from participating in or supervising student-initiated prayers. We will address each asserted error separately.

### 1. Participation

■■■ DISD contends that it cannot prevent its employees from participating in student prayers without violating their employees' rights to the free exercise of religion, to association, and to free speech and academic freedom. We do not agree. As we noted in *Doe I*, " 'the principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause.' " 994 F.2d at 165 (quoting *Lee*, 505 U.S. at 586–87, 112 S.Ct. at 2655). *See also Berger v. Rensselaer Central School Corp.*, 982 F.2d 1160, 1168 (7th Cir.1993) (free expression rights must bow to the Establishment Clause prohibition on school-endorsed religious activities). This is particularly true in the instant context of basketball practices and games. The challenged prayers take place during school-controlled, curriculum-related activities that members of the basketball team are required to attend. During these activities DISD coaches and other school employees are present as representatives of the school and their actions are representative of DISD policies. *See Bishop v. Aronov*, 926 F.2d 1066, 1073 (11th Cir.1991) ("a teacher's [religious] speech can be taken as directly and deliberately representative of the school"). DISD representatives' participation in these prayers improperly entangles it in religion and signals an unconstitutional endorsement of religion. *See also Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226, 251, 110 S.Ct. 2356, 2372–73, 110 L.Ed.2d 191 (1990) (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987)) (EAA valid because it expressly forbids teacher participation and "avoids the prob-

lems of 'the students' emulation of teachers as role models' ").[4]

For these reasons, we find that the district court did not err in enjoining DISD employees and agents from participating in student-initiated prayers.

### 2. Supervision

■■■ DISD contends that the district court's statement that "[s]tudents may voluntarily pray together, provided such prayer is not done with school participation or supervision" contradicts the Supreme Court's holding in *Mergens*, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

In *Mergens*, the Supreme Court upheld the Equal Access Act (EAA) requirement that a non-curricular student prayer group be given the same access to school facilities as other student groups. Under the EAA, school employees can be present at these religious meetings for custodial purposes. *Id.* at 253, 110 S.Ct. at 2373–74.

However, as we explained in *Doe I*, *Mergens* does not apply to the type of activities at issue here. 994 F.2d at 164–65. The facts before us do not even vaguely resemble a *Mergens* situation. Membership on the basketball team is at least extra-curricular: it is directly related to the school's physical education classes and students receive academic credit for their participation. The games are school-sponsored and -controlled events that do not provide any sort of open forum for student expression and DISD makes no claim that it has created such a forum for its basketball team or any other athletic group. Because neither the injunction nor the facts of this case purport to address a genuine *Mergens* situation, we decline to do so here.

We also note that *Jones II* does not require a different result. *Jones II* upheld a school resolution which permitted high school students to choose whether to have a student volunteer deliver a non-sectarian and non-proselytizing invocation and benediction during high school graduation. In concluding that this resolution did not violate the Establishment Clause, we emphasized that high school graduation is a significant, once-in-a-

---

4. However, we note that neither the Establishment Clause nor the district court's order prevent DISD employees from treating students' religious beliefs and practices with deference and respect; indeed, the constitution requires this. Nothing compels DISD employees to make their non-participation vehemently obvious or to leave the room when students pray in, for example, a *Mergens* style setting. However, if while acting in their official capacities, DISD employees join hands in a prayer circle or otherwise manifest approval and solidarity with student religious exercises, they cross the line between respect for religion and endorsement of religion.

lifetime event that could be appropriately marked with a prayer, that the students involved were mature high school seniors, and that the challenged prayer was to be non-sectarian and non-proselytizing. 977 F.2d at 966–972. Here, we are dealing with a setting that is far less solemn and extraordinary, a quintessentially Christian prayer, and students of twelve years of age (the age at which Jane Doe first encountered basketball team prayers). These facts place the prayer at issue here in a materially different position than the one we permitted in *Jones II.*

## B. DISD Choirs' Theme Song

■ DISD contends that the district court erred by enjoining DISD from permitting DISD choirs to sing songs with religious content as their theme songs. The district court enjoined DISD, its employees and agents from:

> 2. initiating, leading, authorizing, encouraging, or condoning the recitation or singing of religious songs as a theme song of the Duncanville school choirs. Religious songs may be sung, however, for their artistic and historic qualities if presented objectively as part of a secular program of education.

The district court made only two findings specific to this issue: (1) that "Jane Doe is a member of the DISD choir and receives academic credit for her participation in the choir"; and (2) that "[a]s a DISD choir member, Jane Doe was required to sing a religious Christian song entitled, *The Lord Bless You and Keep You.* This song is sung at each DISD choir performance and has been adopted by school personnel and students as the choir's theme song." [5]

All parties recognize that the Establishment Clause does not prohibit DISD choirs from singing religious songs as part of a secular music program, in accord with *School District of Abington Township v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). Thus, the Does essentially contend that the act of treating *The Lord Bless You and Keep You* as the theme song, rather than as simply one song in the repertoire, transforms the permissible practice of singing this song into an endorsement of religion. The record reveals that two practical effects flow from designating this as the theme song: it is sung often and it is carried over from year to year. [6]

Legitimate secular reasons exist for maintaining *The Lord Bless You and Keep You* as the theme song. As the choir director, David McCullar, testified, this song is particularly useful to teach students to sight read and to sing *a capella.* In Mr. McCullar's words, it is also "a good piece of music … by a reputable composer."

Neither does utilizing *The Lord Bless You and Keep You* as a theme song advance or endorse religion. The Does do not argue that the choir sings the theme song as a religious exercise per se [7] so we do not accept the notion that repeated singing of a particular religious song amounts to an endorsement of religion. At trial, Mr. McCullar estimated that 60–75 percent of serious choral music is based on sacred themes or text. Given the dominance of religious music in this field, DISD can hardly be presumed to be advancing or endorsing religion by allowing its choirs to sing a religious theme song. As a matter of statistical probability, the song best suited to be the theme is more likely to be religious than not. Indeed, to forbid DISD from having a theme song that is religious would force DISD to disqualify the majority of appropriate choral music simply because it is religious. Within the world of choral music, such a restriction would

---

5. Although the parties place both theme songs in the record at issue, the record is more fully developed with regard to *The Lord Bless You and Keep You.* We presume that both songs are identical in the material ways but in the interest of specificity we will discuss this song in particular.

6. Although students are apparently aware that certain songs are their theme songs, the only concert program in the record does not identify any song as a "theme song."

7. This distinguishes the song here from the prayer set to music in *Doe v. Aldine Indep. School District,* 563 F.Supp. 883 (S.D.Tex.1982). In *Aldine,* the challenged song was a school-composed prayer set to music which students sang before athletic events. The song in *Aldine* was more akin to the pre-game prayers dealt with above than the widely recognized choral music at issue here.

require hostility, not neutrality, toward religion.[8]

A position of neutrality towards religion must allow choir directors to recognize the fact that most choral music is religious. Limiting the number of times a religious piece of music can be sung is tantamount to censorship and does not send students a message of neutrality. Where, as here, singing the theme song is not a religious exercise, we will not find an endorsement of religion exists merely because a religious song with widely recognized musical value is sung more often than other songs. Such animosity towards religion is not required or condoned by the Constitution.[9]

We conclude that the district court erred by enjoining DISD from using songs with religious content as theme songs for its choirs.

### C. Distribution of Gideon Bibles

■ Lastly, the district court enjoined DISD from:

3. leading, authorizing, permitting or condoning the distribution of Bibles to students on school premises and during school hours.

DISD argues that this order is flawed for several reasons. We do not reach these arguments, however, because we conclude that the Does lack standing to assert this claim. Although the district court did not address standing, we will consider this jurisdictional issue first. *In re Taxable Municipal Bond Securities Litigation,* 51 F.3d 518, 521 (5th Cir.1995).

The Does concede that Jane Doe was never a member of any class to which the Gideons distributed Bibles; she did not attend fifth grade in the DISD and first enrolled there in the seventh grade. Instead, the Does argue that John Doe has standing to challenge this policy because he pays taxes in support of the DISD. However, under the specific facts at hand, we conclude that John Doe's status as a taxpayer does not vest him with standing.

■ In order to establish state or municipal taxpayer standing to challenge an Establishment Clause violation, a plaintiff must not only show that he pays taxes to the relevant entity, he must also show that tax revenues are expended on the disputed practice. *Gonzales,* 4 F.3d at 1415–1416. This factor is required to establish both state and municipal taxpayer standing. *Cammack v. Waihee,* 932 F.2d 765, 770 (9th Cir.1991) (surveying cases); *Friedmann v. Sheldon Community School District,* 995 F.2d 802, 803 (8th Cir. 1993). We find no evidence in the record that even suggests that DISD expends any funds on the Gideons' Bible distribution. The Gideons themselves supply the Bibles and simply lay them on a table on the school foyer. The Gideons do not address the students, the school does not make any announcement informing the students about the Bibles, and no school district employees handle the Bibles.[10] There is no evidence that the school district bought the table especially for the Bible distribution or that the table has been set aside for this sole purpose. In sum, there is nothing in the record that would allow us to conclude that DISD expends any funds or resources on its policy of permitting the Gideons to distribute Bibles to the fifth grade class.

---

The fact that singing these songs is not a religious exercise also means that maintaining them as theme songs does not impermissibly entangle government with religion or coerce students into participating in a religious activity.

8. The argument that students likely identify their choir by its theme song is well taken but misses the crucial point that particularly in the world of choral music, singing about religion is not the same as endorsing or exercising religion. Students who identify DISD's choir with *The Lord Bless and Keep You* will certainly feel unity with past choirs from the same school but we are hard pressed to find that this unity necessarily stems from a common belief in Christianity or Judaism

rather than the fact that the earlier students also attended the same high school.

9. The dissent claims that we give DISD more than it asks for on this point by allowing it to continue to sing its theme songs without a student referendum on the subject. However, a fair reading of DISD's argument reveals that DISD is contesting the injunction as entered. DISD's references to student-chosen theme songs are merely attempts to characterize the theme songs currently in place as student initiated.

10. In his testimony, Ed Stevens, superintendent of DISD, suggested that a number of years earlier the DISD was more directly involved with the Gideon's Bible distribution. The Does do not

For this reason, we conclude that John Doe does not have standing.[11] Accordingly, we vacate the district court's judgment as to DISD's policy on Bible distribution and remand for the court to dismiss that portion of the complaint.

For the above reasons, the final judgment and order of the district court is AFFIRMED in part, REVERSED in part, and REMANDED in part for dismissal.

EDITH H. JONES, Circuit Judge, concurring and dissenting:

I concur in Judge Davis's opinion insofar as it rejects an Establishment Clause challenge to the DISD choir's choice of songs or "theme song" and holds the Gideon Bible controversy moot. I dissent with qualifications in the majority's upholding an injunction against active teacher "participation" and "supervision" of the voluntary student-initiated prayers. "Participation," in one sense, cannot constitutionally be prevented by this court, while "supervision," rightly understood, cannot be broader than the concept of the school's encouraging, promoting or leading the prayers.[1]

This decision, like that in *Doe I*, does not prevent students from exercising their constitutional rights of free speech, association and free exercise by praying at appropriate times and in an appropriate manner during athletic practices or games. Further, we must abide by the Supreme Court's decisions, reflected in the injunction, that prevent active school leadership, encouragement or promotion of the prayers. The only questions here are how teachers may respond to student-initiated prayers and to what extent the school may "supervise" the prayers. My differences with the majority are those of emphasis.

There is practically no doubt that the trend in Supreme Court establishment clause cases supports the majority's decision insofar as it prevents teachers from actively joining in the student-led prayers, e.g., by joining hands in the prayer circle. Such actions would, according to at least five members of the Supreme Court, too easily connote official endorsement and would imply coercion of non-participants. As the majority properly observed, however, teachers are not prohibited from exercising deference and respect toward student-initiated prayers. I would

contend that either DISD or the Gideons wish to resume this practice.

**11.** The Does also do not contend that Jane Doe has standing by virtue of her exposure to the Bible distribution, *see Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679, 681–83 (6th Cir.1994), and we note that the record would not support such a claim. Indeed, the record strongly suggests that Jane Doe would never have even seen the Bibles, because the fifth grade is housed in a separate school facility than the seventh through twelfth grades.

**1.** Surely this panel's holding does not contravene the statement of principles prepared by the Departments of Justice and Education in summer, 1995, at President Clinton's urging, "to provide school officials with guidance [concerning] the extent to which religious expression and activities are permitted in public schools." The first paragraph of the statement of principles admonishes:

*Student prayer and religious discussion:* The Establishment Clause of the First Amendment does not prohibit purely private religious speech by students. Students therefore have the same right to engage in individual or group prayer and religious discussion during the school day as they do to engage in other comparable activity. For example, students may read their Bibles or other scriptures, say grace before meals, and pray before tests to the same extent they may engage in comparable non-disruptive activities. Local school authorities possess substantial discretion to impose rules of order and other pedagogical restrictions on student activities, but they may not structure or administer such rules to discriminate against religious activity or speech.

See News Release of U.S. Department of Education, Aug. 17, 1995, at 3. Implicit in this protection of student rights is the concept that teachers will be "supervising" the students, however loosely, as they pray. In my reading of it, the court's injunction does not say otherwise.

add to this that the line between deference and sympathetic reverence is a fine one that cannot and should not be policed, if teachers' individual freedom of conscience is to retain any meaning in this context. The federal courts may currently prevent school-sponsored or -promoted religious devotional exercises, but surely they may not reach into the minds of individual teachers to prescribe their responses to student-initiated prayers. Neither Jane Doe nor any federal court in the United States of America may insist upon a purge of the teachers' spiritual response to student prayers.

As for the term "supervision," I agree that this is not technically a *Mergens* case involving the Equal Access Act. What "supervision" means in the context of basketball practices and games is, however, ambiguous. At a broad level, everything that goes on during practice or competition, including student-initiated locker-room or basketball court prayer, is subject to the coaches' "supervision." To outlaw supervision on this level would be to outlaw the otherwise constitutional student-led prayers. Neither the majority nor the district court intends this untenable result. It must be, then, that the injunction pertains only to *active* supervision and is thus redundant of the cautions that the school may not promote, encourage or lead prayers.

Finally, the majority's citation of *Bishop v. Aronov*, 926 F.2d 1066, 1073 (11th Cir.1991) should not be taken as endorsing the entire holding and discussion of that case. *Bishop* involved the very different and troubling question whether a teacher has the right to express his personal religious convictions during the teaching of college classes. The Supreme Court has repeatedly held that teaching about religion is a significant part of students' educational experience. *See Edwards v. Aguillard*, 482 U.S. 578, 605, 107 S.Ct. 2573, 2589–90, 96 L.Ed.2d 510 (1987) (Powell, J., concurring) (familiarity with the nature of religious beliefs is necessary to understand historical and contemporary events); *School District of Abington Township v. Schempp*, 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963) (one's education is not complete without the study of religion and its relationship to civilization).

Integrating religion into the curriculum in subjects where it is clearly appropriate for discussion raises a host of issues beyond the scope of this opinion. Because I do not doubt that the Supreme Court would hold that DISD coaches and other school employees may be taken to represent the school if they actively join in the student-initiated prayers, *Bishop* is relevant only on this narrow point.

MAHON, District Judge, dissenting in part:

Although I join in the majority opinion with respect to DISD's involvement in prayer and the distribution of Gideon Bibles, I respectfully disagree with my colleagues that DISD's choice of religious theme songs for its choirs is consistent with the First Amendment. Viewed as a whole, the facts in this case fully support the district court's prohibition of DISD's participation, in any form, in the use by its choirs of religious theme songs. Accordingly, I dissent from the majority's decision to reverse the district court's ruling on this issue.

Although the majority opinion sets forth many of the facts in the case, it will help to recount here those facts which demonstrate the similarity between the DISD's choice of a religious theme song and its other religious practices, which the majority agree are unconstitutional.

It is undisputed that for some twenty years, DISD, through the actions of its teachers and other employees, permitted, encouraged and even sponsored the recitation of prayers during curricular and extracurricular activities. Prayers were recited during classes. Many events were begun and closed with a prayer. Sports teams recited prayers before games in the locker rooms, after games on the field and in the buses returning to school. At award ceremonies, prayers were recited and DISD teachers distributed pamphlets of religious songs for participants to sing. The prayers and songs were always Christian.

During the same twenty year period, DISD choir teachers treated as the theme song for the ninth grade and high school choirs what the parties have stipulated is a

Christian religious song entitled *The Lord Bless You and Keep You.* The song is in the form of a prayer seeking God's blessings on behalf of a third party.[1] The theme song was sung at the end of each performance except when circumstances made it inappropriate, such as when members of the choir performed as a barbershop quartet. In addition, the choir sang the song on the bus on the way home from performances and at the end of class each Friday. The students were not given an opportunity to choose a new theme song each year or to determine whether to have a theme song at all. Rather, the song was passed on as an established tradition to incoming choir teachers, who in turn taught it to each new group of students. Although there apparently was no formal, written designation of the theme song, choir teachers and students were aware that the specified song was the theme song and treated it accordingly.

DISD's intermediate school choir had a different theme song, which was also a Christian religious song. Although the record is less developed as to this song, *Go Ye Now in Peace,* the evidence shows that it also was sung at the end of each performance.

The district court did not make many specific factual findings with respect to the theme songs, and did not address the songs as a separate legal issue. Rather, the court analyzed DISD's religious practices, including the use of prayers and religious theme songs, as part of a single pattern. Applying the three part test set forth in *Lemon v. Kurtzman,*[2] the court concluded that there was no secular purpose for the practices, that their primary effect was to advance religion, specifically the Christian faith, and that they fostered an excessive entanglement of DISD with the Christian creed. Going further, the

district court found that DISD's policy endorsed religion, and was coercive because students were pressured to participate in the religious practices. Any one of these findings would have been a basis for determining that DISD's practices constituted an impermissible establishment of religion. *See Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (government's compulsion of attendance at and participation in religious exercise violates First Amendment); *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 591–93, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989) (government may not act in way that endorses religion); *Doe v. Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 163 (5th Cir.1993) (violation of Establishment Clause where challenged practice fails to satisfy any one of *Lemon* factors). It is important to note that although the district court therefore prohibited DISD from any involvement in the choice or use of religious theme songs for its choirs, the court expressly acknowledged that religious songs could be presented objectively for their artistic and historic qualities as part of a secular music program.

The district court did not err in viewing DISD's choice of religious theme songs as an inseparable part of its historical pattern of encouraging and endorsing Christian religious beliefs through the activities of its teachers. This is not a case where the choice of theme songs was the only arguably religious practice involved, but one where expression of religious belief was permitted and approved at almost every level of school life. In virtually the same way that prayers were recited during classes, sports and other events, the choirs' theme songs were used to mark the close of performances and the week, and to unify participants in a common outlook. Viewed in this context, the theme songs served as yet another vehicle for inculcating a Christian attitude, and their singing constituted a religious exercise.

1. The words of the song are:
   The Lord bless you and keep you, the Lord lift His countenance upon you; and give you peace, and give you peace, the Lord make his face to shine upon you, and be gracious unto you, be gracious, the Lord be gracious, gracious unto you. Amen, Amen, Amen, Amen, Amen.
   This text, taken from the Old Testament, Numbers VI, 24–26, would be better characterized as Judeo–Christian.

2. 403 U.S. 602, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Under *Lemon,* to survive an Establishment Clause challenge, a statute or practice must have a secular purpose, its primary effect must neither advance nor inhibit religion, and it must not foster excessive government entanglement with religion.

The majority does not disagree with the legal principles applied by the district court. Instead, by ignoring the role and effect of theme songs in general, and the connection between DISD's theme songs and its other religious practices in particular, the majority reaches the conclusion that DISD's religious theme songs had a secular purpose and did not have the effect of advancing or endorsing religion. An analysis of the majority's reasoning shows it to be faulty in several respects.

Before addressing the majority's conclusions, it is important to review DISD's own justification for the choice of religious theme songs for each of its choirs. DISD has offered two purportedly secular reasons for this practice. It asserts, first, that the theme songs solemnize events as did the prayer found to be constitutional in *Jones v. Clear Creek Indep. Sch. Dist.*, 977 F.2d 963 (5th Cir.1992). The holding in *Jones*, however, was limited to very specific circumstances which are not present here. *Jones* upheld a school district resolution that permitted the delivery of a non-sectarian, non-proselytizing prayer in only one context, a high school graduation ceremony, where solemnization was found appropriate to mark a once-in-a-lifetime occasion.[3] By contrast, DISD's choirs' theme songs were sung repeatedly, not only at performances throughout the year, but also on the buses returning from performances and at the end of class each Friday, occasions not generally thought of as requiring a solemnizing ceremony. In asserting that a religious theme song is needed to achieve solemnity in such circumstances, some of the same ones in which DISD traditionally initiated or permitted the recitation of prayers, DISD inadvertently supports the conclusion that it chose religious theme songs not for any secular reason, but for the very purpose of encouraging religious reverence through yet another avenue.

DISD next contends its theme songs provide unity and comraderie for choir mem-bers. To the extent DISD means simply that having a theme song serves to unify choir members, this explanation adds nothing to the analysis, because the challenged injunction does not forbid the use of theme songs, *per se.* Nor does the reference to unity and comraderie, by itself, answer the question of the purpose of having *religious* theme songs. DISD does not specify which elements of its theme songs are critical to creating unity and comraderie. We already know, however, that DISD believes the songs have a solemnizing function, that is, a function most often played by prayer. *See Jones v. Clear Creek Indep. Sch. Dist.*, 930 F.2d 416, 420 (5th Cir.1991) (indicating there is no secular equivalent of a prayer for solemnization purposes). The theme songs were sung in circumstances likely to emphasize their religious message. Further, we cannot ignore the long history of this school district authorizing and encouraging the recitation of Christian prayers, especially as a means to unify the school and its teams before and after competitions and other special events. In light of this history, DISD's choice of theme songs that essentially are prayers can hardly be viewed as a coincidence. Rather, the religious nature of the songs clearly was expected to be an inextricable part of their role in fostering unity and group identification.

Apparently not satisfied with DISD's explanation, the majority finds its own secular reasons for maintaining *God Bless You and Keep You* as the high school choirs' theme song: the song's usefulness for teaching students to sing *a capella* and its worth as a good piece of music by a reputable composer. These characteristics of the song, however, do not answer the question of DISD's purpose in designating it, or any religious song, as a *theme* song. DISD is free to teach religious songs and obtain their secular benefits as part of the music curriculum without giving them the special treatment it has accorded its theme songs. Moreover, the evi-

---

**3.** In addition, the prayer in *Jones* withstood challenge only because students determined whether to have a prayer and what its contents would be without any direction from school officials. 977 F.2d at 970 (comparing *Lee*, where the Supreme Court found a non-sectarian, non-proselytizing prayer at graduation unconstitutional because of the state's involvement in soliciting it and defining its contents). Here it is undisputed that DISD faculty, not students, chose to perpetuate religious theme songs. This aspect of the theme songs is discussed further below.

dence shows that *God Bless You and Keep You* is not unique in the characteristics singled out by the majority. DISD's high school choir director testified that there are from 25 to 50 secular songs that are sung *a capella* and would make suitable theme songs for the choir. In fact, DISD itself has not argued that it chose religious theme songs for their educational or musical qualities, as the majority suggests. Under the circumstances, the majority's attempt to propose secular reasons not even offered by DISD carries no weight. Once it was clear DISD's purported secular purposes for using religious theme songs were actually religious in nature, the district court was justified in concluding that the choice of religious theme songs had no secular purpose.

As with the question of purpose, the majority's narrow findings regarding the effects of designating a religious theme song—that the song was sung often and was carried over from year to year—disregard the characteristic role and resulting effects of a theme song. In common understanding, a theme song is a song used by a group to represent or identify itself. *See* Webster's New World Dictionary of the American Language 1474 (2d College ed. 1972). By choosing a particular song, the group expresses a shared emotion, experience or outlook. The theme song is played at each of the group's meetings or performances and has special significance for the group and for others who identify the group by its song.

DISD intended its choirs' religious theme songs to play this role. Though the theme songs were singled out from the overall music program by their continual singing throughout the year, thereby achieving a prominence not enjoyed by other songs, this was not the sole effect of their designation. More importantly, the theme songs were given special emphasis by their placement at the close of performances and, in the case of the high school choirs' song, its use to end class on Fridays, treatment that served to highlight the songs' sacred character.[4] Choir

members were informed that the song was their theme song and a tradition at the school, thereby being directed, in effect, to at least superficially identify themselves with it. Indeed, the choir teacher testified that the theme song was supposed to give the students a sense of unity, comraderie, belonging, and something to identify with. Since any student, upon learning that a particular song is his or her group's theme song, would look to the words of the song as an important part of its special meaning, the school's designation of a theme song that consists entirely of calls for God's blessing could not help but reinforce existing religious belief and convey the impression to believers and nonbelievers alike that the school favored religion. In fact, Jane Doe indicated she felt the choirs' theme songs reflected and embodied DISD's favor for Christian beliefs. The district court did not err in determining that DISD's choice of religious theme songs had the primary effect of advancing and endorsing religion. *See Jones II*, 977 F.2d at 967 (practice advances religion if it increases religious conviction); *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 593–94, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472 (1989) (endorsement occurs where government gives message that religion or a particular religious belief is favored or preferred).

Adopting DISD's reasoning, the majority attempts to minimize the significance of the choice of a religious theme song by pointing to the choir teacher's estimate that 60–75 percent of serious choral music is based on sacred themes or text. Considering these figures, it suggests, statistical probability would predict that a religious song would be best suited to serve as the theme song. This apparent logic obscures the real questions at issue—the purpose and effects of DISD choosing religious theme songs. This is not a case where the students, or even the teachers, have picked a theme song each year and statistics would predict the choice of a religious song some percentage of the time. Nor has DISD directly claimed that it chose its particular theme songs because they were

---

4. The evidence suggests that DISD choir performances were carefully arranged to give religious songs, including the theme songs, the role that prayers played in other DISD events. For example, during the time that Jane Doe was in the intermediate school choir, one performance began with the song *Before Our Lord and King* and ended with the theme song. The rest of the songs in the performance were secular in nature.

better suited to that purpose than any secular songs.[5] Thus, there is no basis to conclude that the relative percentages of religious and secular music have had any bearing on DISD's purpose in choosing a religious theme song. Similarly, that religious songs may constitute the majority of serious choral music does not minimize the religious effects, discussed above, of DISD designating a religious theme song.[6]

Not only does the majority stretch to circumvent the district court's reasonable conclusions, but it grants greater relief than DISD has argued for in its appellate briefs. The district court's injunction enjoins DISD from "initiating, leading, authorizing, encouraging or condoning" the recitation or singing of religious songs as theme songs. DISD does not argue that this entire part of the injunction should be overturned, as the majority has done, but only that, under *Jones II,* if *students* choose a religious theme song, the school should be able to lead, authorize and condone its singing. In other words, DISD essentially concedes that the school district itself may not properly initiate or encourage the choice of a religious song as a theme song. Therefore, at a minimum, we should affirm the injunction to the extent it prohibits the school from initiating or encouraging the choice of religious theme songs.[7]

In addition, however, we should also affirm as to the prohibition on DISD authorizing, leading or condoning a student-chosen religious theme song. First, the evidence shows that a large number of DISD students are well aware, through the chain of siblings and teachers, that the district schools have a tradition of prayer and using specific religious theme songs. Most DISD students have supported these traditions. As a result, any choice of a theme song by students from a pool of songs that includes DISD's "traditional" theme songs is unlikely to be truly free.

Moreover, even if made without pressure of any sort, a majority student vote would not validate the choice of a religious theme song. Since DISD has not indicated otherwise, we can assume that if students chose a religious theme song, DISD would treat it in the same fashion as in the past. In other words, the sacred qualities of the song would be emphasized such that its singing would be a form of religious exercise. This would be true in any event because, as discussed earlier, designation of a theme song, whether by faculty or students, is certain to endow the words of the song with special meaning and demand facial allegiance from the group. School supervision, leadership and control of the choir, including the teaching, practicing and performance of the theme song, would place pressure on all choir members to participate in and identify with that song. Thus, the school district's authorizing, leading and condoning of a student-chosen religious theme song would still have the effect of

---

5. Of course, to the extent DISD has argued that the purpose of its religious theme songs is to promote solemnity and unity, it implies that the religious nature of the songs is the very quality that makes them best suited to the purpose. Presumably, however, when the majority speaks of a song being best suited to be a theme song, it refers to secular qualities it imagines might be important in a theme song.

6. The majority also adopts DISD's argument that because religious songs constitute a majority of choral music, preventing DISD from choosing a religious theme song actually amounts to hostility against religion. However, neither DISD nor the majority have shown that DISD's use of only secular songs as theme songs would have the effect of inhibiting religion or denying the importance of religious choral music. The district court's injunction does not limit in any way the number or percentage of religious songs the choir may include in its music program, or the

number of times any religious song may be sung; based on the conclusion that DISD's religious theme song had an impermissible purpose and effect, it simply prevents a religious song from being given the special treatment associated with a theme song. Though the effect may be to limit religious exercises in some circumstances, requiring the government to refrain from practices that advance or endorse religion does not constitute hostility against religion. *See Lee,* 505 U.S. at 586–87, 112 S.Ct. at 2655; *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 225–26, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963); *Karen B. v. Treen,* 653 F.2d 897, 902–03 (5th Cir.1981), *aff'd,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982).

7. Since the evidence shows that DISD's affirmative involvement in the choice of a religious theme song had no secular purpose and had the primary effect of advancing and endorsing religion, even if DISD did not concede this point the injunction should be upheld in this respect.

advancing and endorsing religion and would act as a coercive force on dissenters. *See Lee*, 505 U.S. at 592–93, 112 S.Ct. at 2658 (school district's supervision and control of graduation ceremony pressures attending students, at a minimum, to show respect for invocation and benediction). As the majority notes with respect to student-initiated prayer, neither *Jones* nor *Board of Education of Westside Community Schools v. Mergens* [8] permit this kind of school involvement in student-initiated religious activities during the regular curriculum-related program.

Because the record supports the injunction against any school involvement in the choice or use of a religious theme song, I would affirm the district court on this issue.

8.   496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191      (1990).