DISSENT FROM DENIAL OF REHEARING EN BANC

EDITH H. JONES, Circuit Judge,
with whom E. GRADY JOLLY, JERRY E. SMITH, RHESA HAWKINS BARKSDALE, EMILIO M. GARZA and DeMOSS, Circuit Judges, join,
dissenting:
The First Amendment says Congress shall make no law respecting an establishment of religion, and under Supreme Court rulings, the Amendment has come to mean that *282 states shall make no such laws. The First Amendment, in other words, limits government action that creates an establishment of religion. But the Supreme Court has never held that students may not express their private religious convictions by means of appropriate voluntary prayer in school. In overturning the Mississippi school prayer statute, leaving a sliver of liberty for student-initiated graduation ceremony prayers, the Fifth Circuit has transformed the Establishment Clause from a shield against government religious indoctrination to a sword attacking personal religious behavior.
Just as unfortunate as the court’s invasion of civil liberty is its misapplication of traditional doctrines of judicial restraint to achieve that result. The court had no warrant either to adjudicate a case in which plaintiffs have not been injured and cannot assert a justiciable controversy, or to decide the facial constitutionality of this statute. Sadly, this exercise of judicial boldness may be explained, though it cannot be justified, by the lack of guidance from the Supreme Court’s Establishment Clause jurisprudence. The Court’s decisions in this aréa more closely resemble ad hoc Delphic pronouncements than models of guiding legal principle. It is no wonder lower courts and the public are led adrift and astray. Religious liberty has invariably been the victim of the uncertainty. From the Fifth Circuit’s refusal to rehear this case en banc, I respectfully dissent.
I. The Statute and its Treatment by the Panel
The Mississippi School Prayer Statute aimed at enabling the conduct of voluntary, student-initiated prayer in connection with public schooling. The statute states as its purpose:
... to protect the freedom of speech guaranteed by the First Amendment to the United States Constitution, to define for the citizens of Mississippi the rights and privileges that are accorded them on public school property, other public property or other property at school-related events; and to provide guidance to public school officials on the rights and requirements of law that they must apply. The intent and purpose of the Legislature is to accommodate the free exercise of religious rights of its student citizens in the public schools and at public school events as provided to them by the First Amendment to the United States Constitution and the judicial interpretations thereof as given by the United States Supreme Court.
1994 Miss.Laws Ch. 609, § 1(1). Without otherwise limiting the free exercise of religion and speech (Section 1(3)), the statute permits:
[o]n public school property, other public property or other property, invocations, benedictions or nonsectarian, nonprosely-tizing student-initiated voluntary prayer ... during compulsory or noneompulsory school-related student assemblies, student sporting events, graduation or commencement ceremonies and other school-related student events.
The statute disclaims state support, approval or sanction of any prayer or similar activity that occurs on public property, and it disavows the promotion or establishment of any religion or religious belief. Id. at § 1(4). A severability clause seeks to protect the bulk of the statute to the extent any of its provisions is held invalid or unconstitutional. Id. at § 1(5).
There is no doubt of the breadth of this statute, and notwithstanding its disclaimer, the vulnerability of some of its aspects to constitutional challenge. Whether, for instance, participation in student-initiated prayer could be imposed on unwilling students in a “compulsory” setting may be dubious. Compare Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). But to admit a potential for unconstitutional application is not to condemn the entire statute.
Any simplistic description of the statute’s operation is belied by the daunting variety of activities daily undertaken on school property. Students gather before, during and after school, at lunch, in activity rooms or on the field, for all sorts of curricular, extracurricular and quasi-curricular events. Testimony in this case listed a few of the types of assemblies alone: scholastic achievement assemblies, beauty pageants, guest speakers, *283 programs, athletics, matters initiated by students, PTA, civic clubs, Boy Scouts, pep rallies. Precisely because the initiation of voluntary student prayer rests with students rather than school administrators, and because federal courts never permitted the law to take effect, there was no evidence in the district court as to how or when the statute might be invoked.
Rather than admit that construing this statute depends upon private, not state action, the Fifth Circuit found guilt by mischar-acterization. Relying on conclusional statements of school officials and the “enormous interest in prayer” related to the Bishop Knox suspension,[1] the court declares, “[i]mplementation of the statute would inevitably lead to improper state involvement in school prayer” and would require school officials “to decide who prays” and to monitor prayers’ content. Ingebretsen v. Jackson Public School District, 88 F.3d 274, 278 (5th Cir.1996). The court assumes that prayers may even be given by teachers, administrators or clergy, that attendance will be compulsory and non-attendants punished. Id. at 279. These conclusions are not based on any facts but solely on predictions and hypothetical spawned by a broadly drafted statute.
Once the panel accepted this mistaken impression of state control over the prayers, its result was predictable. The panel deployed three “tests” that the Supreme Court has used to determine the parameters of the Establishment Clause. Although one of these tests has been repeatedly discredited but not overruled,[2] and the other two have never been fully adopted or explained,[3] they were deemed sufficient to the panel’s task of holding the school prayer statute qua “state prayer statute” unconstitutional.[4] Unfortunately, its blow struck not just the mythical ogre of state-sponsored prayer but the sincere, praiseworthy desire of students to join in prayers of their own making.
II. Case or Controversy Limits— Standing/Ripeness
The panel first went wrong by concluding that the plaintiffs had standing to sue to invalidate the school prayer statute. Standing is the Article III ease or controversy requirement that a plaintiff assert injury in order to sue in federal court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The doctrine of standing implements a fundamental principal of judicial restraint.[5] As Justice Powell observed, “relaxation of standing requirements is directly related to the expansion of judicial power.” United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).
A court’s decisions are hypothetical or advisory if a case presents no injury to repair. Dispense with injury, and judges may be advisors or revisers of the legislature, but they are no longer deciding live cases or controversies. Their role has expanded, *284 their jurisdiction has drastically increased if the standing requirement diminishes.
In three ways, one could assert “injury” to the plaintiffs who sued to invalidate the Mississippi school prayer statute. Although neither the plaintiffs nor the court relied on two of the assertions, they illuminate the evanescence of the notion of injury employed by the court.
First, some of the plaintiffs are parents and students in Jackson, Mississippi public schools. Status alone, however, hardly connotes injury.[6] A plaintiff must be so situated to the constitutional violation as to have suffered real and immediate injury, traceable to the defendant’s conduct.[7] In consequence, no parent ought to be allowed to sue over a school policy with which he disagrees unless the policy has demonstrably injured him or his child. Recognizing the frailty of this position, plaintiffs did not assert that then-status alone conferred standing.
Second, the panel found standing because the statute makes “inappropriate government involvement in religious affairs inevitable.” Ingebretsen, 88 F.3d at 278 (quoting Karen B. v. Treen, 653 F.2d 897, 902 (5th Cir.1981), affirmed, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982)). Inevitability, like status, may suggest incipient injury, but it does not reflect an extant fact of injury. Moreover, this conclusion of inevitability reflects the panel’s confusion of student-initiated prayers with state-controlled prayers. The Mississippi prayer statute authorizes but does not compel voluntary student-initiated prayer, and it expressly provides that it is to be construed consistent with First Amendment law. It is impossible to predict when or how the statute might be invoked by students. Because the statute never went in effect, no one testified how students would react to it. The school district had set no policies for its implementation, although contrary to the panel’s earlier assertion, the district already forbade teachers from leading or organizing prayers and would not compel dissenting students to remain present.
Refuting both the status theory and inevitability theory of injury, this court has held that a plaintiff who was not an elementary student in a public school district could not attack the district’s alleged policy authorizing Gideon Bible distribution in elementary schools. Doe v. Duncanville ISD, II, 70 F.3d 402 (5th Cir.1995).[8] Standing is not ordinarily, and is certainly not in this case, an arcane concept. The panel’s fear that national publicity surrounding the Bishop Knox controversy would inspire a proliferation of student prayers under the new statute may or may not be valid, but fear of exposure to student-initiated prayers in the future is simply not injury.[9]
A third concept of standing, previously articulated only in First Amendment free speech cases, attributes injury to a plaintiffs allegation that he intends to engage in protected speech or expressive conduct that may violate a statute. City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Relatedly, he may assert he is injured because the existence of the allegedly unconstitutional ordinance de *285 ters or chills the exercise of free speech rights and causes either continuing harm or a real and immediate threat of future injury. For obvious reasons, plaintiffs asserted neither type of injury in this case. Their free speech rights were unaffected by a policy that allows voluntary, student-initiated speech which happens to be prayerful.
On the contrary, the real chilling effect of the federal court’s injunction falls upon students who have now been deterred from exercising their constitutional rights of free speech, assembly and religious practice in conjunction with school events.
One other way to look at the justiciability of this case is to say that the controversy is not ripe until allegedly unconstitutional regulations are promulgated under the statute or unconstitutional prayer occurs or is actually scheduled to occur. See IBA C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532.1 (1984) (ripeness serves “the central perception ... that courts should not render decisions absent a genuine need to resolve a real dispute”). The court was unwilling to let events take their course under the statute and trust to the good will of students and school administrators to implement it properly.
Whether the panel reached the “right” decision on some imagined exegesis of the statute is not the issue for justiciability purposes. Rather, the question is whether these plaintiffs suffered or are in imminent danger of themselves suffering injury from the mere existence of the statute, as opposed to its particular application in the future. These plaintiffs did not sufficiently demonstrate injury. The case did not present a factual, specific dispute. The court thus acted as advisor or reviser, not as adjudicator, and rendered its decision based on a wholly hypothetical, “worst-case” scenario about the application of the statute.
III. Standard of Facial Invalidity
As it treated the question of standing, so the panel summarily opted for the jurisprudential approach of striking down the Mississippi school prayer statute on its face, in toto, rather than deferring a constitutional law decision until the statute has actually been applied. Facial constitutionality analysis was justified in a footnote with two citations. Ingebretsen, 88 F.3d at 279 n. 2. In my view, this technique misfires because plaintiffs cannot plausibly maintain that there is “no set of circumstances” under which the statute may be constitutionally applied.
The reasons for a distinction between facial and “as applied” challenges — and for a court’s disavowing promiscuous declarations of facial invalidity — seem obvious. Courts owe heavy deference to legislative enactments and to the presumption that legislators can independently gauge their constitutionality. The doctrine of facial invalidity obtains where no narrowing construction of a statute can save it. United States v. Salerno, 481 U.S. 739, 744, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). In First Amendment free speech cases, declarations of facial invalidity have been more frequent, although still imposed cautiously, because of the chilling effect such laws might have on free expression, an effect not claimed by plaintiffs here. Id. Even in an abortion ease, this court has refused to declare a statute facially unconstitutional. Barnes v. Mississippi 992 F.2d 1335, 1342 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993).[10]
Establishment Clause cases do not deviate from this rule of judicial restraint. There is precedent for both facial and as-applied challenges to statutes on Establishment Clause grounds, but the Supreme Court has acknowledged that it has not delineated the consequences of those two approaches. Bowen v. Kendrick, 487 U.S. 589, 602, 108 S.Ct. 2562, 2570, 101 L.Ed.2d 520 (1988). Bowen, however, upheld on its face the Adolescent Family Life Act, which permitted federal funding of religious organizations for adolescent sexual counseling. The Court re *286 manded for a more discriminating consideration of the statute’s validity as applied. Significantly, in other cases where the Court has held statutes facially to represent an unconstitutional establishment, there was no room for a narrowing construction; each such statute dictated the state’s unconstitutional involvement with religion.[11]
In contrast with statutes susceptible to no narrowing construction, the essence of the School Prayer Statute, even more than in Bowen, is the manifold variety of its possible constructions and applications. The amount and type of state involvement with voluntary student prayer is unforeseeable because invocation of the statute depends not on the state but on private students. It would be ludicrous to assert, and the panel did not attempt to do so, that there “is no set of circumstances” under which the Mississippi prayer statute can be upheld. Salerno, supra. In fact, the court conceded the statute’s validity as applied to graduation prayers pursuant to Jones v. Clear Creek ISD, 977 F.2d 963 (5th Cir.1992), cert. denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993), and it must be constitutional to facilitate student prayer as permitted in Doe v. Duncanville II, supra.
Critically, holding the statute not facially invalid or deferring consideration of facial validity is a different matter than facially upholding it across the board in every possible way. Only experience with the statute would tell whether it fulfills the promise of empowering student-initiated free speech/ free exercise of religion or is misused to compel state-sponsored prayer. The panel’s decision to strike down the entire statute preemptively expanded its authority at the expense of the legislature and unwarrantedly limited the legislature’s flexibility to run Mississippi’s schools.
IV. Why This Case Matters
This case matters because it breaches the limits of judicial authority to achieve results that are offensive to religious liberty and the sound upbringing of our children. The panel’s departures from standard rules of judicial restraint have been explained above. It has long been thought prudent, indeed obligatory, for a court to avoid discussing difficult but unnecessary constitutional issues. Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Here, neither plaintiffs’ lack of standing nor trepidation over a premature declaration of facial invalidity persuaded the panel to forebear.
But beyond the errors of judicial craft lies a deeper significance. The panel’s decision is the latest in a long line of cases whose inevitable consequence has been to remake society in a secular image. Two examples suffice: courts have held that the mere existence of a Good Friday holiday “establishes” the Christian religion,[12] and the venerable inscription on a courthouse “The World Needs God” likewise constitutionally offends ... someone.[13] Only by recognizing the absurdity of holding otherwise have courts allowed us still to pledge that we are “one nation under God, indivisible” and to maintain “In God We Trust” on the currency. When our cultural heritage and tradition, indeed the three-millennial history of the Western world threatens to be erased by three decades of federal court pronouncements, something is amiss.[14] As Prof. Stephen Carter arrestingly concluded, our elite cultural institutions, including federal courts, have imposed on us an historically unprecedented “culture of disbelief.”[15]
The elites’ tin ear for religious belief and practice has been particularly evident in cases regarding the public schools. Federal *287 courts often seem unable to draw fundamental distinctions between school-sponsored religious “establishment” and benign teaching about religion or, as in this case, students’ constitutionally protected free exercise of speech and religion.[16] School officials, averse to the emotional and financial costs of litigation, have systematically excised religious references from school curricula and activities in response to the caselaw. This widespread Establishment Clause misconstruction occurs notwithstanding that Supreme Court justices have repeatedly acknowledged the importance of teaching about religion in public schools[17] and that no Supreme Court authority limits students’ nondisruptive religious self-expression. Not to belabor the point, I note that Congress passed and the Supreme Court upheld the Equal Access Act, a law guaranteeing students’ rights to meet in religious clubs on public school property, in order to overturn lower federal court decisions to the contrary.[18] Only last summer, President Clinton spoke of the problem of hostility to religion in public schools and instructed the Departments of Justice and Education to formulate guidelines for the protection of public school students’ religious speech and conduct.[19] Every time a federal court writes an unduly broad Establishment Clause decision concerning public schools, we encourage further misunderstandings, to the detriment of students’ constitutional rights and the goal of teaching about religion in public schools.
The courts’ broad decisions in this area are not only in my view, uncompelled by precedent, they are also extraordinarily shortsighted. Decisions fostering rigidly secular public education strip school officials of moral tools that lie at the heart of the educational process. As the Rev. Martin Luther King explained:
The function of education, therefore, is to teach one to think intensively and to think critically. But education which stops with efficiency may prove the greatest menace to society. The most dangerous criminal may be the man gifted with reason but with no morals.
We must remember that intelligence is not enough. Intelligence plus character— that is the goal of true education.
The WORDS of Martin LutheR King, Jr. 41 (ed. Coretta Scott King) (1993). Character education, whose roots lie deepest and firmest in precepts of religious morality, has been the ultimate casualty of the courts’ careless Establishment Clause jurisprudence.
Eager judicial intrusions into the educational process have also spawned decrees that inhibit school leaders’ flexibility to accommodate varying social conditions. Intuitively, it appears that different approaches are required to encourage educational success, including character building success, in a Chicago ghetto, a Dallas suburb or a small Tennessee town. Yet local control of schools, a cornerstone of American public education, has had to give way to a growing body of *288 federalized, nationally binding Establishment Clause jurisprudence.
Paraphrasing George Orwell, we have sunk to the point at which it becomes one’s duty to restate the obvious. What seems obvious to me is that disputes like these, deeply enmeshed in social and political policy, are not well handled by the adjudication process. Court decrees, focused on the single goal of pure “non-establishment,” supplant decisions based on compromise and consensus which reflect the multifaceted wisdom of the people acting through democratically accountable elected officials and educators. Moreover, the accumulated precedential effect of the courts’ secularizing decisions has stretched beyond each particular dispute to discourage and thwart moral and religious elements in public education.[20] It is precisely because of the tension between adjudicative decision-making and well-rounded social policy-making that courts fashioned self-constraints on declarations of facial unconstitutionality. It is because the Founders recognized the distinction between mere adjudication and lawmaking that Article III requires a real case or controversy, implicating standing to sue, ripeness and justiciability. A forthright sense of judicial modesty also compels such limitations on the judicial process. Neither judicial modesty nor principles of judicial restraint have been notably evident in decisions involving religion and the public schools.
This case, striking down Mississippi’s attempt to accommodate students’ desire — and constitutional right — voluntarily to pray aloud at school, is a paradigm of the errors that bedevil Establishment Clause jurisprudence. The court reached out to condemn the entire statute on its face even though no plaintiff had been injured or could realistically assert standing, and even though certain constitutional applications of it are mandated by our caselaw. The court’s decision was premised not on actual facts but upon a hypothetical, worst-case application of the statute. The court dealt unsympathetically, to say the least, with the motivation for the statute, a motivation shared by the vast majority of the American people that life is more meaningful, education more dignified, morality fortified when voluntary, student-initiated prayer is permitted. It was not the court’s prerogative under traditional principles of judicial restraint to strike down this statute. I DISSENT from the denial of rehearing en banc.

. Bishop Knox was the school principal who was briefly suspended for allowing students to recite a brief morning prayer over the intercom. The case received national press attention and created a big stir in Jackson.

. See the “Lemon test,” from Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), nominally applied in Lamb’s Chapel v. Center Moriches Sch. Dist., 508 U.S. 384, 395 & n. 7, 113 S.Ct. 2141, 2148 & n. 7, 124 L.Ed.2d 352 (1993). Justice Scalia noted in a separate Lamb's Chapel opinion that six members of the Supreme Court as of 1993 had seriously criticized Lemon. Id. at 398, 113 S.Ct. at 2150 (Scalia, J., concurring in judgment).

. The panel referred to the “coercion test," Lee v. Weisman, supra, and the “endorsement test,” County of Allegheny v. ACLU, 492 U.S. 573, 594, 109 S.Ct. 3086, 3100-3101, 106 L.Ed.2d 472 (1989).

. If it were necessary, I would take issue with the panel’s interpretation of the Supreme Court’s establishment clause "tests”. Criticizing the substance of this decision is beside the point, however, because as explained above, the panel should never have reached difficult substantive establishment clause issues.

. See, e.g., Society of Separationists v. Herman, 959 F.2d 1283 (5th Cir.) (en banc) (Higginbotham, J.), cert. denied 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992); National Treasury Employees Union v. Department of Treasury, 25 F.3d 237, 240-41 (5th Cir.1994); Henschen v. City of Houston, 959 F.2d 584 (5th Cir.1992).

. There is a doctrine of taxpayer standing in Establishment Clause cases, Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), but that is not at issue here.

. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); Cramer v. Skinner, 931 F.2d 1020 (5th Cir.), cert. denied, 502 U.S. 907, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).

. See also, O'Hair v. Hill, 641 F.2d 307, 310 (5th Cir.1981) (without suffering actual injury, plaintiffs had no standing to make a First Amendment challenge to a provision of the Texas Constitution).

.The panel supported its "inevitability” theory of injury by relying on Karen B. v. Treen, 653 F.2d 897 (5th Cir.1981), affirmed, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982), but that is an entirely different case. In Karen B„ teachers were authorized to seek volunteers to pray in regular classes every day and failing any volunteers to offer prayer themselves; they were also required to monitor the prayers. Id. at 902. Thus, the existence of prayer sponsored by the school was a foregone conclusion. Here, whether prayers will occur at all depends not on the school but on student, i.e. private initiative. The nature and form of prayer requests is no more foreseeable than requests by FFA or Junior Achievement to speak at school assemblies or over the public address system.

. But compare Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452 (8th Cir.1995), cert. denied, Janklow v. Planned Parenthood, Sioux Falls Clinic, - U.S. -, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (holding contra Barnes and Justice Stevens's concurrence to the denial of certiorari in Janklow v. Planned Parenthood, Sioux Falls Clinic, - U.S. -, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996), with Justice Scalia's dissent from denial of certiorari in that case. Id.

. See, e.g., Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (holding Louisiana "Creationism Act” facially invalid); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

. Metzl v. Leininger, 57 F.3d 618 (7th Cir.1995).

. Doe v. County of Montgomery, IL., 41 F.3d 1156 (7th Cir.1994).

. The inconsistency in application of the establishment clause filters down to the parchment commissions for Article III judges, each of which was signed “In the Year of Our Lord.”

. Stephen L. Carter, THE CULTURE OF DISBELIEF: HOW AMERICAN LAW AND POLITICS TRIVIALIZE RELIGIOUS DEVOTION (1993).

. See, e.g., Hedges v. Wauconda Comm. Unit Sch. Dist. No. 118, 9 F.3d 1295 (7th Cir.1993) (appeals court overturns lower court decision prohibiting eighth grade student from distributing religious pamphlets); Mozert v. Hawkins County Bd. Educ., 827 F.2d 1058 (6th Cir.1987), cert. denied, 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988) (parents may not remove children from class with religiously offensive reading materials); Settle v. Dickson County Sch. Bd., 53 F.3d 152 (6th Cir.), cert. denied, - U.S. -, 116 S.Ct. 518, 133 L.Ed.2d 426 (1995); Hsu v. Roslyn Union Free Sch. Dist. No. 3, 876 F.Supp. 445 (E.D.N.Y.1995) (student Bible club could not reject non-believers as officers), aff'd in part and rev’d in part, 85 F.3d 839 (2d Cir.1996) (appeals court overturns lower court decision holding that student Bible club could not reject non-believers as officers).

. Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); School Dist. of Abington Township, Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

. Equal Access Act, 20 U.S.C. §§ 4071-4074; Board of Education v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

. See President's Directive to the Education Dept., and News Release of U.S. Dept. of Education, Aug. 17, 1995. The Directive states that the President "sharefs] the concern and frustration that many Americans feel about situations where the protections accorded by the First Amendment are not recognized or understood.” President Clinton instructed the Departments of Justice and Education “to provide school officials with guidance [concerning] the extent to which religious expression and activities are permitted in public schools."

. Jones v. Clear Creek ISD, supra, authorizing voluntary, student-initiated graduation prayer; Doe v. Duncanville ISD, II, supra authorizing voluntary student sports prayers.