# SANTA FE INDEPENDENT SCHOOL DISTRICT *v.* DOE, INDIVIDUALLY AND AS NEXT FRIEND FOR HER MINOR CHILDREN, ET AL.

No. 99–62.   Argued March 29, 2000—Decided June 19, 2000

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST,

C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 318.

*Jay Alan Sekulow* argued the cause for petitioner. With him on the briefs were *Colby M. May, James M. Henderson, Sr., Mark N. Troobnick, Walter M. Weber, Paul D. Clement, John G. Stepanovich, Thomas P. Monaghan, Stuart J. Roth, John P. Tuskey, Joel H. Thornton, David A. Cortman,* and *Kelly Shackelford.*

*John Cornyn,* Attorney General of Texas, argued the cause for the State of Texas et al. as *amici curiae* urging reversal. With him on the brief were *Andy Taylor,* First Assistant Attorney General, *Linda S. Eads,* Deputy Attorney General, *Gregory S. Coleman,* Solicitor General, *Julie Caruthers Parsley,* Deputy Solicitor General, and *Meredith B. Parenti,* Assistant Solicitor General.

*Anthony P. Griffin* argued the cause for respondents. With him on the briefs were *Douglas Laycock* and *Steven R. Shapiro.**

---

*Briefs of *amici curiae* urging reversal were filed for the Christian Legal Society by *Steffen N. Johnson, Stephen M. Shapiro, Michael W. McConnell,* and *Kimberlee W. Colby;* for Liberty Counsel et al. by *Mathew D. Staver* and *Jerry Falwell, Jr.;* for the Northstar Legal Center by *Jordan W. Lorence;* for Spearman Independent School District et al. by *Roger D. Hepworth;* for the Texas Association of School Boards Legal Assistance Fund by *David M. Feldman* and *Myra C. Schexnayder;* for the Texas Justice Foundation et al. by *Linda L. Schlueter;* for Senator James M. Inhofe et al. by *Barry C. Hodge;* for Congressman Steve Largent et al. by *Brett M. Kavanaugh;* for Marian Ward et al. by *Kelly J. Coghlan;* and for Texas Public School Students et al. by *John L. Carter.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Congress et al. by *Walter E. Dellinger* and *Marc D. Stern;* and for the Baptist Joint Committee on Public Affairs et al. by *Derek H. Davis* and *Melissa Rogers.*

Briefs of *amici curiae* were filed for the Rutherford Institute by *John W. Whitehead, Steven H. Aden,* and *James A. Hayes, Jr.;* and for the Student Press Law Center by *Richard A. Simpson* and *S. Mark Goodman.*

JUSTICE STEVENS delivered the opinion of the Court.

Prior to 1995, the Santa Fe High School student who occupied the school's elective office of student council chaplain delivered a prayer over the public address system before each varsity football game for the entire season. This practice, along with others, was challenged in District Court as a violation of the Establishment Clause of the First Amendment. While these proceedings were pending in the District Court, the school district adopted a different policy that permits, but does not require, prayer initiated and led by a student at all home games. The District Court entered an order modifying that policy to permit only nonsectarian, nonproselytizing prayer. The Court of Appeals held that, even as modified by the District Court, the football prayer policy was invalid. We granted the school district's petition for certiorari to review that holding.

## I

The Santa Fe Independent School District (District) is a political subdivision of the State of Texas, responsible for the education of more than 4,000 students in a small community in the southern part of the State. The District includes the Santa Fe High School, two primary schools, an intermediate school and the junior high school. Respondents are two sets of current or former students and their respective mothers. One family is Mormon and the other is Catholic. The District Court permitted respondents (Does) to litigate anonymously to protect them from intimidation or harassment.[1]

---

[1] A decision, the Fifth Circuit Court of Appeals noted, that many District officials "apparently neither agreed with nor particularly respected." 168 F. 3d 806, 809, n. 1 (CA5 1999). About a month after the complaint was filed, the District Court entered an order that provided, in part:

"[A]ny further attempt on the part of District or school administration, officials, counsellors, teachers, employees or servants of the School District, parents, students or anyone else, overtly or covertly to ferret out the identities of the Plaintiffs in this cause, by means of bogus petitions, questionnaires, individual interrogation, or downright 'snooping', will

Respondents commenced this action in April 1995 and moved for a temporary restraining order to prevent the District from violating the Establishment Clause at the imminent graduation exercises. In their complaint the Does alleged that the District had engaged in several proselytizing practices, such as promoting attendance at a Baptist revival meeting, encouraging membership in religious clubs, chastising children who held minority religious beliefs, and distributing Gideon Bibles on school premises. They also alleged that the District allowed students to read Christian invocations and benedictions from the stage at graduation ceremonies,[2] and to deliver overtly Christian prayers over the public address system at home football games.

On May 10, 1995, the District Court entered an interim order addressing a number of different issues.[3] With re-

cease immediately. ANYONE TAKING ANY ACTION ON SCHOOL PROPERTY, DURING SCHOOL HOURS, OR WITH SCHOOL RESOURCES OR APPROVAL FOR PURPOSES OF ATTEMPTING TO ELICIT THE NAMES OR IDENTITIES OF THE PLAINTIFFS IN THIS CAUSE OF ACTION, BY OR ON BEHALF OF ANY OF THESE INDIVIDUALS, WILL FACE THE HARSHEST POSSIBLE CONTEMPT SANCTIONS FROM THIS COURT, AND MAY ADDITIONALLY FACE CRIMINAL LIABILITY. The Court wants these proceedings addressed on their merits, and not on the basis of intimidation or harassment of the participants on either side." App. 34–35.

[2] At the 1994 graduation ceremony the senior class president delivered this invocation:

"Please bow your heads.

"Dear heavenly Father, thank you for allowing us to gather here safely tonight. We thank you for the wonderful year you have allowed us to spend together as students of Santa Fe. We thank you for our teachers who have devoted many hours to each of us. Thank you, Lord, for our parents and may each one receive the special blessing. We pray also for a blessing and guidance as each student moves forward in the future. Lord, bless this ceremony and give us all a safe journey home. In Jesus' name we pray." Id., at 19.

[3] For example, it prohibited school officials from endorsing or participating in the baccalaureate ceremony sponsored by the Santa Fe Ministerial Alliance, and ordered the District to establish policies to deal with

spect to the impending graduation, the order provided that "non-denominational prayer" consisting of "an invocation and/or benediction" could be presented by a senior student or students selected by members of the graduating class. The text of the prayer was to be determined by the students, without scrutiny or preapproval by school officials. References to particular religious figures "such as Mohammed, Jesus, Buddha, or the like" would be permitted "as long as the general thrust of the prayer is non-proselytizing." App. 32.

In response to that portion of the order, the District adopted a series of policies over several months dealing with prayer at school functions. The policies enacted in May and July for graduation ceremonies provided the format for the August and October policies for football games. The May policy provided:

> " 'The board has chosen to permit the graduating senior class, with the advice and counsel of the senior class principal or designee, to elect by secret ballot to choose whether an invocation and benediction shall be part of the graduation exercise. If so chosen the class shall elect by secret ballot, from a list of student volunteers, students to deliver nonsectarian, nonproselytizing invocations and benedictions for the purpose of solemnizing

"manifest First Amendment infractions of teachers, counsellors, or other District or school officials or personnel, such as ridiculing, berating or holding up for inappropriate scrutiny or examination the beliefs of any individual students. Similarly, the School District will establish or clarify existing procedures for excluding overt or covert sectarian and proselytizing religious teaching, such as the use of blatantly denominational religious terms in spelling lessons, denominational religious songs and poems in English or choir classes, denominational religious stories and parables in grammar lessons and the like, while at the same time allowing for frank and open discussion of moral, religious, and societal views and beliefs, which are non-denominational and non-judgmental." *Id.*, at 34.

their graduation ceremonies.'" 168 F. 3d 806, 811 (CA5 1999) (emphasis deleted).

The parties stipulated that after this policy was adopted, "the senior class held an election to determine whether to have an invocation and benediction at the commencement [and that the] class voted, by secret ballot, to include prayer at the high school graduation." App. 52. In a second vote the class elected two seniors to deliver the invocation and benediction.[4]

In July, the District enacted another policy eliminating the requirement that invocations and benedictions be "non-sectarian and nonproselytising," but also providing that if the District were to be enjoined from enforcing that policy, the May policy would automatically become effective.

The August policy, which was titled "Prayer at Football Games," was similar to the July policy for graduations. It also authorized two student elections, the first to determine whether "invocations" should be delivered, and the second to select the spokesperson to deliver them. Like the July policy, it contained two parts, an initial statement that omitted any requirement that the content of the invocation be "non-sectarian and nonproselytising," and a fallback provision that automatically added that limitation if the preferred policy should be enjoined. On August 31, 1995, according to the parties' stipulation: "[T]he district's high school students voted to determine whether a student would deliver prayer at varsity football games. . . . The students chose to allow a

---

[4] The student giving the invocation thanked the Lord for keeping the class safe through 12 years of school and for gracing their lives with two special people and closed: "Lord, we ask that You keep Your hand upon us during this ceremony and to help us keep You in our hearts through the rest of our lives. In God's name we pray. Amen." Id., at 53. The student benediction was similar in content and closed: "Lord, we ask for Your protection as we depart to our next destination and watch over us as we go our separate ways. Grant each of us a safe trip and keep us secure throughout the night. In Your name we pray. Amen." Id., at 54.

student to say a prayer at football games." *Id.*, at 65. A week later, in a separate election, they selected a student "to deliver the prayer at varsity football games." *Id.*, at 66.

The final policy (October policy) is essentially the same as the August policy, though it omits the word "prayer" from its title, and refers to "messages" and "statements" as well as "invocations."[5] It is the validity of that policy that is before us.[6]

---

[5] Despite these changes, the school did not conduct another election, under the October policy, to supersede the results of the August policy election.

[6] It provides:

"STUDENT ACTIVITIES:

"PRE-GAME CEREMONIES AT FOOTBALL GAMES

"The board has chosen to permit students to deliver a brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition.

"Upon advice and direction of the high school principal, each spring, the high school student council shall conduct an election, by the high school student body, by secret ballot, to determine whether such a statement or invocation will be a part of the pre-game ceremonies and if so, shall elect a student, from a list of student volunteers, to deliver the statement or invocation. The student volunteer who is selected by his or her classmates may decide what message and/or invocation to deliver, consistent with the goals and purposes of this policy.

"If the District is enjoined by a court order from the enforcement of this policy, then and only then will the following policy automatically become the applicable policy of the school district.

"The board has chosen to permit students to deliver a brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition.

"Upon advice and direction of the high school principal, each spring, the high school student council shall conduct an election, by the high school student.body, by secret ballot, to determine whether such a mes-

The District Court did enter an order precluding enforcement of the first, open-ended policy. Relying on our decision in *Lee* v. *Weisman*, 505 U. S. 577 (1992), it held that the school's "action must not 'coerce anyone to support or participate in' a religious exercise." App. to Pet. for Cert. E7. Applying that test, it concluded that the graduation prayers appealed "to distinctively Christian beliefs,"[7] and that delivering a prayer "over the school's public address system prior to each football and baseball game coerces student participation in religious events."[8] Both parties appealed, the District contending that the enjoined portion of the October policy was permissible and the Does contending that both alternatives violated the Establishment Clause. The Court of Appeals majority agreed with the Does.

The decision of the Court of Appeals followed Fifth Circuit precedent that had announced two rules. In *Jones* v. *Clear Creek Independent School Dist.*, 977 F. 2d 963 (1992), that court held that student-led prayer that was approved by a vote of the students and was nonsectarian and nonproselytizing was permissible at high school graduation ceremonies. On the other hand, in later cases the Fifth Circuit made it clear that the *Clear Creek* rule applied only to high school

---

sage or invocation will be a part of the pre-game ceremonies and if so, shall elect a student, from a list of student volunteers, to deliver the statement or invocation. The student volunteer who is selected by his or her classmates may decide what statement or invocation to deliver, consistent with the goals and purposes of this policy. Any message and/or invocation delivered by a student must be nonsectarian and nonproselytizing." *Id.*, at 104–105.

[7] "The graduation prayers at issue in the instant case, in contrast, are infused with explicit references to Jesus Christ and otherwise appeal to distinctively Christian beliefs. The Court accordingly finds that use of these prayers during graduation ceremonies, considered in light of the overall manner in which they were delivered, violated the Establishment Clause." App. to Pet. for Cert. E8.

[8] *Id.*, at E8–E9.

graduations and that school-encouraged prayer was constitutionally impermissible at school-related sporting events. Thus, in *Doe v. Duncanville Independent School Dist.*, 70 F. 3d 402 (1995), it had described a high school graduation as "a significant, once in-a-lifetime event" to be contrasted with athletic events in "a setting that is far less solemn and extraordinary." *Id.*, at 406–407.[9]

In its opinion in this case, the Court of Appeals explained:

"The controlling feature here is the same as in *Duncanville:* The prayers are to be delivered *at football games*—hardly the sober type of annual event that can be appropriately solemnized with prayer. The distinction to which [the District] points is simply one without difference. Regardless of whether the prayers are selected by vote or spontaneously initiated at these frequently-recurring, informal, school-sponsored events, school officials are present and have the authority to stop the prayers. Thus, as we indicated in *Duncanville*, our decision in *Clear Creek II* hinged on the singular context and singularly serious nature of a graduation ceremony. Outside that nurturing context, a Clear Creek Prayer Policy cannot survive. We therefore reverse the district court's holding that [the District's] alternative Clear Creek Prayer Policy can be extended to football games, irrespective of the presence of the nonsectarian, nonproselytizing restrictions." 168 F. 3d, at 823.

The dissenting judge rejected the majority's distinction between graduation ceremonies and football games. In his

---

[9] Because the dissent overlooks this case, it incorrectly assumes that a "prayer-only policy" at football games was permissible in the Fifth Circuit. See *post*, at 323 (opinion of REHNQUIST, C. J.).

opinion the District's October policy created a limited public forum that had a secular purpose[10] and provided neutral accommodation of noncoerced, private, religious speech.[11]

We granted the District's petition for certiorari, limited to the following question: "Whether petitioner's policy permitting student-led, student-initiated prayer at football games violates the Establishment Clause." 528 U. S. 1002 (1999). We conclude, as did the Court of Appeals, that it does.

## II

The first Clause in the First Amendment to the Federal Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Fourteenth Amendment imposes those substantive limitations on the legislative power of the States and their political subdivisions. *Wallace* v. *Jaffree*, 472 U. S. 38, 49–50 (1985). In *Lee* v. *Weisman*, 505 U. S. 577 (1992), we held that a prayer delivered by a rabbi at a middle school graduation ceremony violated that Clause. Although this case involves student prayer at a different

[10] "There are in fact several secular reasons for allowing a brief, serious message before football games—some of which [the District] has listed in its policy. At sporting events, messages and/or invocations can promote, among other things, honest and fair play, clean competition, individual challenge to be one's best, importance of team work, and many more goals that the majority could conceive would it only pause to do so.

"Having again relinquished all editorial control, [the District] has created a limited public forum for the students to give brief statements or prayers concerning the value of those goals and the methods for achieving them." 168 F. 3d, at 835.

[11] "The majority fails to realize that what is at issue in this *facial challenge* to this school policy is the neutral accommodation of non-coerced, private, religious speech, which allows students, selected by students, to express their personal viewpoints. The state is not involved. The school board has neither scripted, supervised, endorsed, suggested, nor edited these personal viewpoints. Yet the majority imposes a judicial curse upon sectarian religious speech." *Id.*, at 836.

type of school function, our analysis is properly guided by the principles that we endorsed in *Lee.*

As we held in that case:

> "The principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause. It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" *Id.,* at 587 (citations omitted) (quoting *Lynch* v. *Donnelly,* 465 U. S. 668, 678 (1984)).

In this case the District first argues that this principle is inapplicable to its October policy because the messages are private student speech, not public speech. It reminds us that "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 250 (1990) (opinion of O'CONNOR, J.). We certainly agree with that distinction, but we are not persuaded that the pregame invocations should be regarded as "private speech."

These invocations are authorized by a government policy and take place on government property at government-sponsored school-related events. Of course, not every message delivered under such circumstances is the government's own. We have held, for example, that an individual's contribution to a government-created forum was not government speech. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995). Although the District relies heavily on *Rosenberger* and similar cases involving such

forums,[12] it is clear that the pregame ceremony is not the type of forum discussed in those cases.[13]  The Santa Fe school officials simply do not "evince either 'by policy or by practice,' any intent to open the [pregame ceremony] to 'indiscriminate use,' . . . by the student body generally." *Hazelwood School Dist.* v. *Kuhlmeier,* 484 U. S. 260, 270 (1988) (quoting *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 47 (1983)).  Rather, the school allows only one student, the same student for the entire season, to give the invocation.  The statement or invocation, moreover, is subject to particular regulations that confine the content and topic of the student's message, see *infra,* at 306–307, 309.  By comparison, in *Perry* we rejected a claim that the school had created a limited public forum in its school mail system despite the fact that it had allowed far more speakers to address a much broader range of topics than the policy at issue here.[14]  As we concluded in *Perry,* "selective access does not transform government property into a public forum."  460 U. S., at 47.

---

[12] See, *e. g.,* Brief for Petitioner 44–48, citing *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995) (limited public forum); *Widmar* v. *Vincent,* 454 U. S. 263 (1981) (limited public forum); *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753 (1995) (traditional public forum); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384 (1993) (limited public forum).  Although the District relies on these public forum cases, it does not actually argue that the pregame ceremony constitutes such a forum.

[13] A conclusion that the District had created a public forum would help shed light on whether the resulting speech is public or private, but we also note that we have never held the mere creation of a public forum shields the government entity from scrutiny under the Establishment Clause.  See, *e. g., Pinette,* 515 U. S., at 772 (O'CONNOR, J., concurring in part and concurring in judgment) ("I see no necessity to carve out . . . an exception to the endorsement test for the public forum context").

[14] The school's internal mail system in *Perry* was open to various private organizations such as "[l]ocal parochial schools, church groups, YMCA's, and Cub Scout units."  460 U. S., at 39, n. 2.

Granting only one student access to the stage at a time does not, of course, necessarily preclude a finding that a school has created a limited public forum. Here, however, Santa Fe's student election system ensures that only those messages deemed "appropriate" under the District's policy may be delivered. That is, the majoritarian process implemented by the District guarantees, by definition, that minority candidates will never prevail and that their views will be effectively silenced.

Recently, in *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217 (2000), we explained why student elections that determine, by majority vote, which expressive activities shall receive or not receive school benefits are constitutionally problematic:

> "To the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requires. The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent. That principle is controlling here." *Id.*, at 235.

Like the student referendum for funding in *Southworth*, this student election does nothing to protect minority views but rather places the students who hold such views at the mercy of the majority.[15] Because "fundamental rights may not be

---

[15] If instead of a choice between an invocation and no pregame message, the first election determined whether a political speech should be made, and the second election determined whether the speaker should be a Democrat or a Republican, it would be rather clear that the public address system was being used to deliver a partisan message reflecting the viewpoint of the majority rather than a random statement by a private individual.

The fact that the District's policy provides for the election of the speaker only after the majority has voted on her message identifies an obvious distinction between this case and the typical election of a "stu-

submitted to vote; they depend on the outcome of no elections," *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 638 (1943), the District's elections are insufficient safeguards of diverse student speech.

In *Lee,* the school district made the related argument that its policy of endorsing only "civic or nonsectarian" prayer was acceptable because it minimized the intrusion on the audience as a whole. We rejected that claim by explaining that such a majoritarian policy "does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront." 505 U. S., at 594. Similarly, while Santa Fe's majoritarian election might ensure that *most* of the students are represented, it does nothing to protect the minority; indeed, it likely serves to intensify their offense.

Moreover, the District has failed to divorce itself from the religious content in the invocations. It has not succeeded in doing so, either by claiming that its policy is "'one of neutrality rather than endorsement'"[16] or by characterizing the individual student as the "circuit-breaker"[17] in the process. Contrary to the District's repeated assertions that it has adopted a "hands-off" approach to the pregame invocation, the realities of the situation plainly reveal that its policy involves both perceived and actual endorsement of religion. In this case, as we found in *Lee,* the "degree of school involvement" makes it clear that the pregame prayers bear "the imprint of the State and thus put school-age children who objected in an untenable position." *Id.,* at 590.

The District has attempted to disentangle itself from the religious messages by developing the two-step student

---

dent body president, or even a newly elected prom king or queen." *Post,* at 321.

[16] Brief for Petitioner 19 (quoting *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 248 (1990) (plurality opinion)).

[17] Tr. of Oral Arg. 7.

election process. The text of the October policy, however, exposes the extent of the school's entanglement. The elections take place at all only because the school "board *has chosen to permit* students to deliver a brief invocation and/or message." App. 104 (emphasis added). The elections thus "shall" be conducted "by the high school student council" and "[u]pon advice and direction of the high school principal." *Id.*, at 104–105. The decision whether to deliver a message is first made by majority vote of the entire student body, followed by a choice of the speaker in a separate, similar majority election. Even though the particular words used by the speaker are not determined by those votes, the policy mandates that the "statement or invocation" be "consistent with the goals and purposes of this policy," which are "to solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition." *Ibid.*

In addition to involving the school in the selection of the speaker, the policy, by its terms, invites and encourages religious messages. The policy itself states that the purpose of the message is "to solemnize the event." A religious message is the most obvious method of solemnizing an event. Moreover, the requirements that the message "promote good sportsmanship" and "establish the appropriate environment for competition" further narrow the types of message deemed appropriate, suggesting that a solemn, yet nonreligious, message, such as commentary on United States foreign policy, would be prohibited.[18] Indeed, the only type of message that is expressly endorsed in the text is an "invocation"—a term that primarily describes an appeal for divine

---

[18] THE CHIEF JUSTICE's hypothetical of the student body president asked by the school to introduce a guest speaker with a biography of her accomplishments, see *post*, at 325 (dissenting opinion), obviously would pose no problems under the Establishment Clause.

assistance.[19]    In fact, as used in the past at Santa Fe High School, an "invocation" has always entailed a focused religious message.    Thus, the expressed purposes of the policy encourage the selection of a religious message, and that is precisely how the students understand the policy.    The results of the elections described in the parties' stipulation[20] make it clear that the students understood that the central question before them was whether prayer should be a part of the pregame ceremony.[21]    We recognize the important role that public worship plays in many communities, as well as the sincere desire to include public prayer as a part of various occasions so as to mark those occasions' significance. But such religious activity in public schools, as elsewhere, must comport with the First Amendment.

The actual or perceived endorsement of the message, moreover, is established by factors beyond just the text of the policy.    Once the student speaker is selected and the message composed, the invocation is then delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property. The message is broadcast over the school's public address system, which remains subject to the control of school officials.    It is fair to assume that the pregame ceremony is

---

[19] See, *e. g.,* Webster's Third New International Dictionary 1190 (1993) (defining "invocation" as "a prayer of entreaty that is usu[ally] a call for the divine presence and is offered at the beginning of a meeting or service of worship").

[20] See *supra,* at 297–298, and n. 4.

[21] Even if the plain language of the October policy were facially neutral, "the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S., at 777 (O'CONNOR, J., concurring in part and concurring in judgment); see also *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 534–535 (1993) (making the same point in the Free Exercise Clause context).

clothed in the traditional indicia of school sporting events, which generally include not just the team, but also cheer-leaders and band members dressed in uniforms sporting the school name and mascot. The school's name is likely written in large print across the field and on banners and flags. The crowd will certainly include many who display the school colors and insignia on their school T-shirts, jackets, or hats and who may also be waving signs displaying the school name. It is in a setting such as this that "[t]he board has chosen to permit" the elected student to rise and give the "statement or invocation."

In this context the members of the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration. In cases involving state participation in a religious activity, one of the relevant questions is "whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in public schools." *Wallace*, 472 U. S., at 73, 76 (O'CONNOR, J., concurring in judgment); see also *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 777 (1995) (O'CONNOR, J., concurring in part and concurring in judgment). Regardless of the listener's support for, or objection to, the message, an objective Santa Fe High School student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval.

The text and history of this policy, moreover, reinforce our objective student's perception that the prayer is, in actuality, encouraged by the school. When a governmental entity professes a secular purpose for an arguably religious policy, the government's characterization is, of course, entitled to some deference. But it is nonetheless the duty of the courts to "distinguis[h] a sham secular purpose from a sincere one." *Wallace*, 472 U. S., at 75 (O'CONNOR, J., concurring in judgment).

According to the District, the secular purposes of the policy are to "foste[r] free expression of private persons . . . as well [as to] solemniz[e] sporting events, promot[e] good sportsmanship and student safety, and establis[h] an appropriate environment for competition." Brief for Petitioner 14. We note, however, that the District's approval of only one specific kind of message, an "invocation," is not necessary to further any of these purposes. Additionally, the fact that only one student is permitted to give a content-limited message suggests that this policy does little to "foste[r] free expression." Furthermore, regardless of whether one considers a sporting event an appropriate occasion for solemnity, the use of an invocation to foster such solemnity is impermissible when, in actuality, it constitutes prayer sponsored by the school. And it is unclear what type of message would be both appropriately "solemnizing" under the District's policy and yet nonreligious.

Most striking to us is the evolution of the current policy from the long-sanctioned office of "Student Chaplain" to the candidly titled "Prayer at Football Games" regulation. This history indicates that the District intended to preserve the practice of prayer before football games. The conclusion that the District viewed the October policy simply as a continuation of the previous policies is dramatically illustrated by the fact that the school did not conduct a new election, pursuant to the current policy, to replace the results of the previous election, which occurred under the former policy. Given these observations, and in light of the school's history of regular delivery of a student-led prayer at athletic events, it is reasonable to infer that the specific purpose of the policy was to preserve a popular "state-sponsored religious practice." *Lee*, 505 U. S., at 596.

School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherants "that they are outsiders, not full members of the political community, and an ac-

companying message to adherants that they are insiders, favored members of the political community." *Lynch,* 465 U. S., at 688 (O'CONNOR, J., concurring). The delivery of such a message—over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer—is not properly characterized as "private" speech.

## III

The District next argues that its football policy is distinguishable from the graduation prayer in *Lee* because it does not coerce students to participate in religious observances. Its argument has two parts: first, that there is no impermissible government coercion because the pregame messages are the product of student choices; and second, that there is really no coercion at all because attendance at an extracurricular event, unlike a graduation ceremony, is voluntary.

The reasons just discussed explaining why the alleged "circuit-breaker" mechanism of the dual elections and student speaker do not turn public speech into private speech also demonstrate why these mechanisms do not insulate the school from the coercive element of the final message. In fact, this aspect of the District's argument exposes anew the concerns that are created by the majoritarian election system. The parties' stipulation clearly states that the issue resolved in the first election was "whether a student would deliver prayer at varsity football games," App. 65, and the controversy in this case demonstrates that the views of the students are not unanimous on that issue.

One of the purposes served by the Establishment Clause is to remove debate over this kind of issue from governmental supervision or control. We explained in *Lee* that the "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere." 505 U. S., at 589. The two student elections au-

thorized by the policy, coupled with the debates that presumably must precede each, impermissibly invade that private sphere. The election mechanism, when considered in light of the history in which the policy in question evolved, reflects a device the District put in place that determines whether religious messages will be delivered at home football games. The mechanism encourages divisiveness along religious lines in a public school setting, a result at odds with the Establishment Clause. Although it is true that the ultimate choice of student speaker is "attributable to the students," Brief for Petitioner 40, the District's decision to hold the constitutionally problematic election is clearly "a choice attributable to the State," *Lee*, 505 U. S., at 587.

The District further argues that attendance at the commencement ceremonies at issue in *Lee* "differs dramatically" from attendance at high school football games, which it contends "are of no more than passing interest to many students" and are "decidedly extracurricular," thus dissipating any coercion. Brief for Petitioner 41. Attendance at a high school football game, unlike showing up for class, is certainly not required in order to receive a diploma. Moreover, we may assume that the District is correct in arguing that the informal pressure to attend an athletic event is not as strong as a senior's desire to attend her own graduation ceremony.

There are some students, however, such as cheerleaders, members of the band, and, of course, the team members themselves, for whom seasonal commitments mandate their attendance, sometimes for class credit. The District also minimizes the importance to many students of attending and participating in extracurricular activities as part of a complete educational experience. As we noted in *Lee*, "[l]aw reaches past formalism." 505 U. S., at 595. To assert that high school students do not feel immense social pressure, or have a truly genuine desire, to be involved in the extracurricular event that is American high school football is "formalistic in the extreme." *Ibid.* We stressed in *Lee* the

obvious observation that "adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." *Id.*, at 593. High school home football games are traditional gatherings of a school community; they bring together students and faculty as well as friends and family from years present and past to root for a common cause. Undoubtedly, the games are not important to some students, and they voluntarily choose not to attend. For many others, however, the choice between attending these games and avoiding personally offensive religious rituals is in no practical sense an easy one. The Constitution, moreover, demands that the school may not force this difficult choice upon these students for "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." *Id.*, at 596.

Even if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship. For "the government may no more use social pressure to enforce orthodoxy than it may use more direct means." *Id.*, at 594. As in *Lee*, "[w]hat to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." *Id.*, at 592. The constitutional command will not permit the District "to exact religious conformity from a student as the price" of joining her classmates at a varsity football game.[22]

---

[22] "We think the Government's position that this interest suffices to force students to choose between compliance or forfeiture demonstrates fundamental inconsistency in its argumentation. It fails to acknowledge that what for many of Deborah's classmates and their parents was a spiritual

The Religion Clauses of the First Amendment prevent the government from making any law respecting the establishment of religion or prohibiting the free exercise thereof. By no means do these commands impose a prohibition on all religious activity in our public schools. See, *e. g.*, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 395 (1993); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990); *Wallace*, 472 U. S., at 59. Indeed, the common purpose of the Religion Clauses "is to secure religious liberty." *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962). Thus, nothing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday. But the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer.

## IV

Finally, the District argues repeatedly that the Does have made a premature facial challenge to the October policy that necessarily must fail. The District emphasizes, quite correctly, that until a student actually delivers a solemnizing message under the latest version of the policy, there can be no certainty that any of the statements or invocations will be religious. Thus, it concludes, the October policy necessarily survives a facial challenge.

This argument, however, assumes that we are concerned only with the serious constitutional injury that occurs when a student is forced to participate in an act of religious wor-

---

imperative was for Daniel and Deborah Weisman religious conformance compelled by the State. While in some societies the wishes of the majority might prevail, the Establishment Clause of the First Amendment is addressed to this contingency and rejects the balance urged upon us. The Constitution forbids the State to exact religious conformity from a student as the price of attending her own high school graduation. This is the calculus the Constitution commands." *Lee*, 505 U. S., at 595–596.

ship because she chooses to attend a school event. But the Constitution also requires that we keep in mind "the myriad, subtle ways in which Establishment Clause values can be eroded," *Lynch*, 465 U. S., at 694 (O'CONNOR, J., concurring), and that we guard against other different, yet equally important, constitutional injuries. One is the mere passage by the District of a policy that has the purpose and perception of government establishment of religion. Another is the implementation of a governmental electoral process that subjects the issue of prayer to a majoritarian vote.

The District argues that the facial challenge must fail because "Santa Fe's Football Policy cannot be invalidated on the basis of some 'possibility or even likelihood' of an unconstitutional application." Brief for Petitioner 17 (quoting *Bowen* v. *Kendrick*, 487 U. S. 589, 613 (1988)). Our Establishment Clause cases involving facial challenges, however, have not focused solely on the possible applications of the statute, but rather have considered whether the statute has an unconstitutional purpose. Writing for the Court in *Bowen*, THE CHIEF JUSTICE concluded that "[a]s in previous cases involving facial challenges on Establishment Clause grounds, *e. g., Edwards* v. *Aguillard*, [482 U. S. 578 (1987)]; *Mueller* v. *Allen*, 463 U. S. 388 (1983), we assess the constitutionality of an enactment by reference to the three factors first articulated in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971) . . . , which guides '[t]he general nature of our inquiry in this area,' *Mueller* v. *Allen, supra*, at 394." 487 U. S., at 602. Under the *Lemon* standard, a court must invalidate a statute if it lacks "a secular legislative purpose." *Lemon* v. *Kurtzman*, 403 U. S. 602, 612 (1971). It is therefore proper, as part of this facial challenge, for us to examine the purpose of the October policy.

As discussed, *supra*, at 306–307, 309, the text of the October policy alone reveals that it has an unconstitutional purpose. The plain language of the policy clearly spells out the extent of school involvement in both the election of the speaker

and the content of the message. Additionally, the text of the October policy specifies only one, clearly preferred message—that of Santa Fe's traditional religious "invocation." Finally, the extremely selective access of the policy and other content restrictions confirm that it is not a content-neutral regulation that creates a limited public forum for the expression of student speech. Our examination, however, need not stop at an analysis of the text of the policy.

This case comes to us as the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment Clause. One of those practices was the District's long-established tradition of sanctioning student-led prayer at varsity football games. The narrow question before us is whether implementation of the October policy insulates the continuation of such prayers from constitutional scrutiny. It does not. Our inquiry into this question not only can, but must, include an examination of the circumstances surrounding its enactment. Whether a government activity violates the Establishment Clause is "in large part a legal question to be answered on the basis of judicial interpretation of social facts. . . . Every government practice must be judged in its unique circumstances. . . ." *Lynch,* 465 U. S., at 693–694 (O'CONNOR, J., concurring). Our discussion in the previous sections, *supra,* at 307–310, demonstrates that in this case the District's direct involvement with school prayer exceeds constitutional limits.

The District, nevertheless, asks us to pretend that we do not recognize what every Santa Fe High School student understands clearly—that this policy is about prayer. The District further asks us to accept what is obviously untrue: that these messages are necessary to "solemnize" a football game and that this single-student, year-long position is essential to the protection of student speech. We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer.

Therefore, the simple enactment of this policy, with the purpose and perception of school endorsement of student prayer, was a constitutional violation. We need not wait for the inevitable to confirm and magnify the constitutional injury. In *Wallace*, for example, we invalidated Alabama's as yet unimplemented and voluntary "moment of silence" statute based on our conclusion that it was enacted "for the sole purpose of expressing the State's endorsement of prayer activities for one minute at the beginning of each school day." 472 U. S., at 60; see also *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 532 (1993). Therefore, even if no Santa Fe High School student were ever to offer a religious message, the October policy fails a facial challenge because the attempt by the District to encourage prayer is also at issue. Government efforts to endorse religion cannot evade constitutional reproach based solely on the remote possibility that those attempts may fail.

This policy likewise does not survive a facial challenge because it impermissibly imposes upon the student body a majoritarian election on the issue of prayer. Through its election scheme, the District has established a governmental electoral mechanism that turns the school into a forum for religious debate. It further empowers the student body majority with the authority to subject students of minority views to constitutionally improper messages. The award of that power alone, regardless of the students' ultimate use of it, is not acceptable.[23] Like the referendum in *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S.

---

[23] THE CHIEF JUSTICE accuses us of "essentially invalidat[ing] all student elections," see *post*, at 321. This is obvious hyperbole. We have concluded that the resulting religious message under this policy would be attributable to the school, not just the student, see *supra*, at 301–310. For this reason, we now hold only that the District's decision to allow the student majority to control whether students of minority views are subjected to a school-sponsored prayer violates the Establishment Clause.

217 (2000), the election mechanism established by the District undermines the essential protection of minority viewpoints. Such a system encourages divisiveness along religious lines and threatens the imposition of coercion upon those students not desiring to participate in a religious exercise. Simply by establishing this school-related procedure, which entrusts the inherently nongovernmental subject of religion to a majoritarian vote, a constitutional violation has occurred.[24] No further injury is required for the policy to fail a facial challenge.

To properly examine this policy on its face, we "must be deemed aware of the history and context of the community and forum," *Pinette*, 515 U. S., at 780 (O'CONNOR, J., concurring in part and concurring in judgment). Our examination of those circumstances above leads to the conclusion that this policy does not provide the District with the constitutional safe harbor it sought. The policy is invalid on its face because it establishes an improper majoritarian election on religion, and unquestionably has the purpose and creates the perception of encouraging the delivery of prayer at a series of important school events.

The judgment of the Court of Appeals is, accordingly, affirmed.

*It is so ordered.*

---

[24] THE CHIEF JUSTICE contends that we have "misconstrue[d] the nature . . . [of] the policy as being an election on 'prayer' and 'religion,'" *post*, at 320. We therefore reiterate that the District has stipulated to the facts that the most recent election was held "to determine whether a student would deliver *prayer* at varsity football games," that the "students chose to allow a student to say a *prayer* at football games," and that a second election was then held "to determine which student would deliver the *prayer*." App. 65–66 (emphases added). Furthermore, the policy was titled *"Prayer* at Football Games." *Id.*, at 99 (emphasis added). Although the District has since eliminated the word "prayer" from the policy, it apparently viewed that change as sufficiently minor as to make holding a new election unnecessary.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Court distorts existing precedent to conclude that the school district's student-message program is invalid on its face under the Establishment Clause. But even more disturbing than its holding is the tone of the Court's opinion; it bristles with hostility to all things religious in public life. Neither the holding nor the tone of the opinion is faithful to the meaning of the Establishment Clause, when it is recalled that George Washington himself, at the request of the very Congress which passed the Bill of Rights, proclaimed a day of "public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favors of Almighty God." Presidential Proclamation, 1 Messages and Papers of the Presidents, 1789–1897, p. 64 (J. Richardson ed. 1897).

We do not learn until late in the Court's opinion that respondents in this case challenged the district's student-message program at football games before it had been put into practice. As the Court explained in *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), the fact that a policy might "operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." See also *Bowen* v. *Kendrick*, 487 U. S. 589, 612 (1988). While there is an exception to this principle in the First Amendment overbreadth context because of our concern that people may refrain from speech out of fear of prosecution, *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U. S. 32, 38–40 (1999), there is no similar justification for Establishment Clause cases. No speech will be "chilled" by the existence of a government policy that might unconstitutionally endorse religion over nonreligion. Therefore, the question is not whether the district's policy *may be* applied in violation of the Establishment Clause, but whether it inevitably will be.

The Court, venturing into the realm of prophecy, decides that it "need not wait for the inevitable" and invalidates the district's policy on its face. See *ante*, at 316. To do so, it applies the most rigid version of the oft-criticized test of *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971).[1]

*Lemon* has had a checkered career in the decisional law of this Court. See, *e. g., Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384, 398–399 (1993) (SCALIA, J., concurring in judgment) (collecting opinions criticizing *Lemon*); *Wallace* v. *Jaffree,* 472 U. S. 38, 108–114 (1985) (REHNQUIST, J., dissenting) (stating that *Lemon's* "three-part test represents a determined effort to craft a workable rule from a historically faulty doctrine; but the rule can only be as sound as the doctrine it attempts to service" (internal quotation marks omitted)); *Committee for Public Ed. and Religious Liberty* v. *Regan,* 444 U. S. 646, 671 (1980) (STEVENS, J., dissenting) (deriding "the sisyphean task of trying to patch together the blurred, indistinct, and variable barrier described in *Lemon*"). We have even gone so far as to state that it has never been binding on us. *Lynch* v. *Donnelly,* 465 U. S. 668, 679 (1984) ("[W]e have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area.... In two cases, the Court did not even apply the *Lemon* 'test' [citing *Marsh*

---

[1] The Court rightly points out that in facial challenges in the Establishment Clause context, we have looked to *Lemon's* three factors to "guid[e] [t]he general nature of our inquiry." *Ante,* at 314 (internal quotation marks omitted) (citing *Bowen* v. *Kendrick,* 487 U. S. 589, 602 (1988)). In *Bowen,* we looked to *Lemon* as such a guide and determined that a federal grant program was not invalid on its face, noting that "[i]t has not been the Court's practice, in considering facial challenges to statutes of this kind, to strike them down in anticipation that particular applications may result in unconstitutional use of funds." 487 U. S., at 612 (internal quotation marks omitted). But here the Court, rather than looking to *Lemon* as a guide, applies *Lemon's* factors stringently and ignores *Bowen's* admonition that mere anticipation of unconstitutional applications does not warrant striking a policy on its face.

v. *Chambers,* 463 U. S. 783 (1983), and *Larson* v. *Valente,* 456 U. S. 228 (1982)]"). Indeed, in *Lee* v. *Weisman,* 505 U. S. 577 (1992), an opinion upon which the Court relies heavily today, we mentioned, but did not feel compelled to apply, the *Lemon* test. See also *Agostini* v. *Felton,* 521 U. S. 203, 233 (1997) (stating that *Lemon*'s entanglement test is merely "an aspect of the inquiry into a statute's effect"); *Hunt* v. *McNair,* 413 U. S. 734, 741 (1973) (stating that the *Lemon* factors are "no more than helpful signposts").

Even if it were appropriate to apply the *Lemon* test here, the district's student-message policy should not be invalidated on its face. The Court applies *Lemon* and holds that the "policy is invalid on its face because it establishes an improper majoritarian election on religion, and unquestionably has the purpose and creates the perception of encouraging the delivery of prayer at a series of important school events." *Ante,* at 317. The Court's reliance on each of these conclusions misses the mark.

First, the Court misconstrues the nature of the "majoritarian election" permitted by the policy as being an election on "prayer" and "religion."[2] See *ante,* at 314, 317. To the contrary, the election permitted by the policy is a two-fold process whereby students vote first on whether to have a student speaker before football games at all, and second, if the students vote to have such a speaker, on who that speaker will be. App. 104–105. It is conceivable that the election could become one in which student candidates campaign on platforms that focus on whether or not they will

---

[2] The Court attempts to support its misinterpretation of the nature of the election process by noting that the district stipulated to facts about the most recent election. See *ante,* at 317, n. 24. Of course, the most recent election was conducted under the *previous* policy—a policy that required an elected student speaker to give a pregame invocation. See App. 65–66, 99–100. There has not been an election under the policy at issue here, which expressly allows the student speaker to give a message as opposed to an invocation.

pray if elected. It is also conceivable that the election could lead to a Christian prayer before 90 percent of the football games. If, upon implementation, the policy operated in this fashion, we would have a record before us to review whether the policy, as applied, violated the Establishment Clause or unduly suppressed minority viewpoints. But it is possible that the students might vote not to have a pregame speaker, in which case there would be no threat of a constitutional violation. It is also possible that the election would not focus on prayer, but on public speaking ability or social popularity. And if student campaigning did begin to focus on prayer, the school might decide to implement reasonable campaign restrictions.[3]

But the Court ignores these possibilities by holding that merely granting the student body the power to elect a speaker that may choose to pray, "regardless of the students' ultimate use of it, is not acceptable." *Ante*, at 316. The Court so holds despite that any speech that may occur as a result of the election process here would be *private*, not *government*, speech. The elected student, not the government, would choose what to say. Support for the Court's holding cannot be found in any of our cases. And it essentially invalidates all student elections. A newly elected student body president, or even a newly elected prom king or queen, could use opportunities for public speaking to say prayers. Under the Court's view, the mere grant of power

---

[3] The Court's reliance on language regarding the student referendum in *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217 (2000), to support its conclusion with respect to the election process is misplaced. That case primarily concerned free speech, and, more particularly, mandated financial support of a public forum. But as stated above, if this case were in the "as applied" context and we were presented with the appropriate record, our language in *Southworth* could become more applicable. In fact, *Southworth* itself demonstrates the impropriety of making a decision with respect to the election process without a record of its operation. There we remanded in part for a determination of how the referendum functions. See *id.*, at 235–236.

to the students to vote for such offices, in light of the fear that those elected might publicly pray, violates the Establishment Clause.

Second, with respect to the policy's purpose, the Court holds that "the simple enactment of this policy, with the purpose and perception of school endorsement of student prayer, was a constitutional violation." *Ante,* at 316. But the policy itself has plausible secular purposes: "[T]o solemnize the event, to promote good sportsmanship and student safety, and to establish the appropriate environment for the competition." App. 104–105. Where a governmental body "expresses a plausible secular purpose" for an enactment, "courts should generally defer to that stated intent." *Wallace,* 472 U. S., at 74–75 (O'CONNOR, J., concurring in judgment); see also *Mueller* v. *Allen,* 463 U. S. 388, 394–395 (1983) (stressing this Court's "reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). The Court grants no deference to—and appears openly hostile toward—the policy's stated purposes, and wastes no time in concluding that they are a sham.

For example, the Court dismisses the secular purpose of solemnization by claiming that it "invites and encourages religious messages." *Ante,* at 306; Cf. *Lynch,* 465 U. S., at 693 (O'CONNOR, J., concurring) (discussing the "legitimate secular purposes of solemnizing public occasions"). The Court so concludes based on its rather strange view that a "religious message is the most obvious means of solemnizing an event." *Ante,* at 306. But it is easy to think of solemn messages that are not religious in nature, for example urging that a game be fought fairly. And sporting events often begin with a solemn rendition of our national anthem, with its concluding verse "And this be our motto: 'In God is our trust.'" Under the Court's logic, a public school that spon-

sors the singing of the national anthem before football games violates the Establishment Clause. Although the Court apparently believes that solemnizing football games is an illegitimate purpose, the voters in the school district seem to disagree. Nothing in the Establishment Clause prevents them from making this choice.[4]

The Court bases its conclusion that the true purpose of the policy is to endorse student prayer on its view of the school district's history of Establishment Clause violations and the context in which the policy was written, that is, as "the latest step in developing litigation brought as a challenge to institutional practices that unquestionably violated the Establishment Clause." *Ante*, at 308–309, 315. But the context—attempted compliance with a District Court order—actually demonstrates that the school district was acting diligently to come within the governing constitutional law. The District Court ordered the school district to formulate a policy consistent with Fifth Circuit precedent, which permitted a school district to have a prayer-only policy. See *Jones* v. *Clear Creek Independent School Dist.*, 977 F. 2d 963 (CA5 1992). But the school district went further than required by the District Court order and eventually settled on a policy that gave the student speaker a choice to deliver either an

---

[4] The Court also determines that the use of the term "invocation" in the policy is an express endorsement of that type of message over all others. See *ante*, at 306–307. A less cynical view of the policy's text is that it permits many types of messages, including invocations. That a policy tolerates religion does not mean that it improperly endorses it. Indeed, as the majority reluctantly admits, the Free Exercise Clause mandates such tolerance. See *ante*, at 313 ("[N]othing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday"); see also *Lynch* v. *Donnelly*, 465 U. S. 668, 673 (1984) ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any").

invocation or a message. In so doing, the school district exhibited a willingness to comply with, and exceed, Establishment Clause restrictions. Thus, the policy cannot be viewed as having a sectarian purpose.[5]

The Court also relies on our decision in *Lee* v. *Weisman*, 505 U. S. 577 (1992), to support its conclusion. In *Lee*, we concluded that the content of the speech at issue, a graduation prayer given by a rabbi, was "directed and controlled" by a school official. *Id.*, at 588. In other words, at issue in *Lee* was *government* speech. Here, by contrast, the potential speech at issue, if the policy had been allowed to proceed, would be a message or invocation selected or created by a student. That is, if there were speech at issue here, it would be *private* speech. The "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect," applies with particular force to the question of endorsement. *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 250 (1990) (plurality opinion) (emphasis in original).

Had the policy been put into practice, the students may have chosen a speaker according to wholly secular criteria—like good public speaking skills or social popularity—and the student speaker may have chosen, on her own accord, to deliver a religious message. Such an application of the policy

---

[5] *Wallace* v. *Jaffree*, 472 U. S. 38 (1985), is distinguishable on these grounds. There we struck down an Alabama statute that added an express reference to prayer to an existing statute providing a moment of silence for meditation. *Id.*, at 59. Here the school district added a secular alternative to a policy that originally provided only for prayer. More importantly, in *Wallace*, there was "unrebutted evidence" that pointed to a wholly religious purpose, *id.*, at 58, and Alabama "conceded in the courts below that the purpose of the statute was to make prayer part of daily classroom activity," *id.*, at 77–78 (O'CONNOR, J., concurring in judgment). There is no such evidence or concession here.

would likely pass constitutional muster. See *Lee, supra,* at 630, n. 8 (SOUTER, J., concurring) ("If the State had chosen its graduation day speakers according to wholly secular criteria, and if one of those speakers (not a state actor) had individually chosen to deliver a religious message, it would be harder to attribute an endorsement of religion to the State").

Finally, the Court seems to demand that a government policy be completely neutral as to content or be considered one that endorses religion. See *ante,* at 305. This is undoubtedly a new requirement, as our Establishment Clause jurisprudence simply does not mandate "content neutrality." That concept is found in our First Amendment *speech* cases and is used as a guide for determining when we apply strict scrutiny. For example, we look to "content neutrality" in reviewing loudness restrictions imposed on speech in public forums, see *Ward* v. *Rock Against Racism,* 491 U. S. 781 (1989), and regulations against picketing, see *Boos* v. *Barry,* 485 U. S. 312 (1988). The Court seems to think that the fact that the policy is not content neutral somehow controls the Establishment Clause inquiry. See *ante,* at 305.

But even our speech jurisprudence would not require that all public school actions with respect to student speech be content neutral. See, *e. g., Bethel School Dist. No. 403* v. *Fraser,* 478 U. S. 675 (1986) (allowing the imposition of sanctions against a student speaker who, in nominating a fellow student for elective office during an assembly, referred to his candidate in terms of an elaborate sexually explicit metaphor). Schools do not violate the First Amendment every time they restrict student speech to certain categories. But under the Court's view, a school policy under which the student body president is to solemnize the graduation ceremony by giving a favorable introduction to the guest speaker would be facially unconstitutional. Solemnization "invites and encourages" prayer and the policy's content limitations

prohibit the student body president from giving a solemn, yet nonreligious, message like "commentary on United States foreign policy." See *ante*, at 306.

The policy at issue here may be applied in an unconstitutional manner, but it will be time enough to invalidate it if that is found to be the case. I would reverse the judgment of the Court of Appeals.